A.M. ALEXANDER, Charles Alexander, et al., Plaintiffs-Appellees,

v.

FULTON COUNTY, GEORGIA;  Jacquelyn H. Barrett, Individually and in her Official Capacity as Sheriff of Fulton County, Georgia, Defendants-Appellants.

No. 97-8189.

United States Court of Appeals,

Eleventh Circuit.

March 30, 2000.

Appeals from the United States District Court for the Northern District of Georgia. (No 93-02131-1-CV-WBH), Willis B. Hunt, Jr., Judge.

Before ANDERSON, Chief Judge, MARCUS, Circuit Judge, and HANCOCK[*], Senior District Judge.

MARCUS, Circuit Judge:

This case involves various claims of race discrimination brought by eighteen current and former Fulton County Sheriff's Department employees individually and on behalf of all similarly situated white employees of the Sheriff's Department against Fulton County, Georgia and Sheriff Jacquelyn H. Barrett, in her official and individual capacities (collectively, "Defendants").  Plaintiffs sued Fulton County and Sheriff Barrett alleging that Fulton County maintained a "policy or custom" of racial discrimination in employment decisions, that Fulton County and the Sheriff's Department engaged in a "pattern or practice" of employment discrimination, and specifically that Fulton County and Sheriff Barrett intentionally discriminated on the basis of race with respect to discipline, promotions, transfers, reclassifications, promotional examinations, restorations of rank, and appointments to unclassified positions.  Defendants now appeal from a jury verdict entered for most of the Plaintiffs finding that Fulton County maintained a policy or custom of discrimination against white employees and that Sheriff Barrett intentionally discriminated against white employees.  After a thorough review of the record, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

---

[*]Honorable James H. Hancock, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

I.

In September 1993, Plaintiffs[1] filed their complaint as a class action alleging a "pattern or practice"

of employment discrimination against white personnel of the Fulton County Sheriff's Department in the terms

and conditions of employment in violation of 42 U.S.C. § 1981,[2] 42 U.S.C. § 1983,[3] and Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*[4]  In April 1994, the district court, finding the requisite

numerosity, commonality, typicality, and adequacy of representation, certified under Rule 23(b)(2) of the

Federal Rules of Civil Procedure the following class:[5]

---

[1]The Plaintiffs are:  Major A.M. Alexander, Sergeant Charles "Tony" Alexander, Sergeant Joseph Bantin, Sergeant Billy Bolt, Sergeant Denise Brooks, Lieutenant Robert Fox, Captain Gary Gettis, Corporal Sara Henderson, Sergeant Kathy Jones, Lieutenant Carolyn Masson, Corporal Donnie McBee, Corporal Guerry "Bubba" Moore, Sergeant James NeSmith, Sergeant Joan Paschal, Sergeant Heidi Schaefer, Sergeant Robert Smith, Sergeant Benjamin Steele, and Corporal Robert Upshaw.

[2]Section 1981 provides in pertinent part:  "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

[3]Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...."

[4]42 U.S.C. § 2000e-2 provides in relevant part:

> a) Employer practices
>
> It shall be an unlawful employment practice for an employer-
>
> > (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's race, color, religion, sex, or national origin....

> Certain Plaintiffs also claimed employment discrimination on the grounds of age, disability, retaliation and gender.  Before trial, the parties agreed to sever those claims from this lawsuit.

[5]Rule 23(b)(2) includes those class action suits where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  This subdivision was added

2

All present and future sworn white employees of the Fulton County Sheriff's Department and all past sworn white employees who allege discriminatory acts by Defendants within the applicable statute of limitations.

On June 12, 1996, after an extended trial, the jury awarded damages to fifteen of the eighteen Plaintiffs and the district court entered judgment.[6] On July 8, 1996, Plaintiffs moved to amend the judgment, requesting injunctive relief and back pay, and, on July 10, 1996, the district court vacated the judgment. Thereafter, the district court entered a modified judgment for damages, backpay, individual equitable relief, and class-based injunctive relief.

The jury verdict and final judgment included the following for each Plaintiff:

1. *Major A.M. Alexander*—The jury found that the Defendants had discriminated against Alexander with respect to assignments or transfers and that he had been disciplined in whole or in part because of his race. The jury awarded Alexander $125,000 in compensatory damages against both Fulton County and Sheriff Barrett and $25,000 in punitive damages against Sheriff Barrett for discriminatory assignments or transfers. The jury also awarded Alexander $2,800 in back pay, an additional $125,000 in compensatory damages against Fulton County and Sheriff Barrett, and $25,000 in punitive damages against Sheriff Barrett for his suspension. The district court also ordered that the record of disciplinary action against Alexander be expunged from his Sheriff's Department file.

2. *Sergeant Charles "Tony" Alexander*—The jury awarded Charles Alexander $15,000 in compensatory damages because of Sheriff Barrett's failure to restore Alexander's rank after his voluntary demotion from sergeant to deputy. The district court ordered the Defendants to recalculate Alexander's retirement benefits and other employee benefits to reflect any changes that would have occurred had his rank been restored.

---

specifically to Rule 23 to facilitate civil rights class actions. *See Kincade v. General Tire & Rubber Co.,* 635 F.2d 501, 506 n. 6 (5th Cir.1981). The district court concluded that this subdivision best described Plaintiffs' putative class.

[6]The jury did not indicate on which theory of liability it relied in reaching its verdict. However, because the substantive law and proof requirements of Title VII, section 1981, and section 1983 are the same for claims alleging intentional employment discrimination based on race by state actors, this failure to identify the particular basis of liability does not present any insurmountable problems for appellate review. *See, e.g., Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998) (explaining that "[b]oth [Title VII and section 1981] have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well."); *Cross v. State of Ala.,* 49 F.3d 1490, 1507-08 (11th Cir.1995) (noting that when section 1983 is used as a parallel remedy for violation of Title VII the elements of the two causes of action are the same).

3. *Sergeant Joseph Bantin*—The jury found in favor of Bantin on his claims that Sheriff Barrett did not consider him for appointment to the unclassified[7] positions of captain or major on account of his race, and that he was not permitted to compete in the promotional process for the rank of classified lieutenant, also because of race. Finally, the jury returned a verdict for the Defendants on Bantin's claim that he had not been considered for reclassification because of his race. The jury awarded Bantin $10,000 in compensatory and $5,000 in punitive damages based on its finding of discrimination against Bantin in the promotional process.

4. *Sergeant Billy Bolt*—The jury found that Bolt was wrongfully not appointed to the classified position of lieutenant in June 1993 because of his race and awarded him $20,000 in compensatory damages and $5,000 in punitive damages. The district court also entered an award of $1,000.98 in back pay and ordered the Defendants to reclassify Bolt as a lieutenant providing him with the pay grade, employee benefits, and seniority he would have achieved had he been appointed to the rank of classified lieutenant on June 1, 1993.

5. *Sergeant Denise Brooks*—The jury found that Brooks was not selected for appointment to the unclassified positions of captain or major due to her race. The jury concluded that Brooks should have been appointed as an unclassified captain in June 1993 and awarded her $10,000 in compensatory damages and $10,000 in punitive damages. The jury also found that she was discriminated against with respect to assignments or transfers and awarded her an additional $25,000 in compensatory damages and $5,000 in punitive damages. The district court also ordered the Defendants to provide Brooks with the pay grade, employee benefits, and seniority she would have achieved had she been appointed to captain on June 1, 1993.

6. *Lieutenant Robert Fox*—The jury found that Fox was not appointed to the position of unclassified captain in March 1993 and was transferred to a position in the Jail against his will in 1994 because of race. The jury awarded Fox $20,000 in compensatory damages and $10,000 in punitive damages on his failure to promote claim. It awarded him an additional $50,000 in compensatory damages and $10,000 in punitive damages on his discriminatory assignment or transfer claim. The district court ordered the Defendants to recalculate Fox's retirement and other benefits as if he had been appointed to an unclassified captain position on March 1, 1993.

7. *Captain Gary Gettis*—The jury found that Gettis was not appointed to the unclassified positions of captain or major due to his race. The jury concluded that in the absence of discrimination, Gettis would have been appointed to an unclassified captain position in June 1993, and awarded him $10,000 in compensatory damages and $10,000 in punitive damages. The district court also awarded Gettis $2,290.59 in back pay, the amount he would have received had he been appointed to an unclassified captain position in June 1993, and ordered the Defendants to recalculate Gettis' retirement and other employee benefits as if he had been appointed to an unclassified captain position on June 1, 1993.

8. *Corporal Sara Henderson*—The jury found that Henderson was not considered for appointment to the unclassified positions of captain or major on account of her race. However, the jury found

---

[7]Unclassified positions are like political appointments; they are appointed by the Sheriff and can be terminated at will. Classified positions are explicitly subject to civil service-type protections and comprise the vast majority of jobs in the Sheriff's Department. *See* discussion *infra* section II.

against Henderson on her claim that she was denied promotions to the positions of classified corporal and sergeant in 1993 because of race. The jury did not award her *any* damages.

9. *Sergeant Kathy Jones*—The jury found that Jones was denied transfers outside the Jail because of race and awarded her $10,000 in compensatory damages and $5,000 in punitive damages. The district court declined to award injunctive relief to Jones.

10. *Lieutenant Carolyn Masson*—The jury found that Masson was not considered or selected for appointment to the unclassified positions of captain or major due to her race and that she was also discriminated against with regard to assignments or transfers because of her race. As for not selecting her to an unclassified position, the jury concluded that Masson should have been appointed to an unclassified captain position in June 1993 and awarded her $10,000 in compensatory damages and $10,000 in punitive damages. As for its findings concerning the assignments or transfers, the jury awarded Masson an additional $50,000 in compensatory damages and $10,000 in punitive damages. The district court also awarded Masson $5,412.99 in back pay to compensate her for wages she would have received had she been appointed to the position of unclassified captain in June 1993. The court also ordered the Defendants to provide Masson with the pay grade, employee benefits, and seniority she would have earned had she been appointed to the position of captain on June 1, 1993.

11. *Corporal Donnie McBee*—Although the jury found for McBee on his claim that he was not considered for appointment to the unclassified positions of captain or major because of his race, it found his failure to be selected for these positions was not on account of his race. The jury also concluded McBee had not been discriminated against with respect to assignments or transfers. Accordingly, the jury did not award McBee any damages.

12. *Corporal Guerry "Bubba" Moore*—The jury found that Moore was not considered for appointment to the unclassified positions of captain or major because of race, but found that his failure to be selected for appointment to these positions was not on account of race. The jury did find, however, that Moore had been discriminated against on the basis of race with regard to assignments or transfers and awarded him $10,000 in compensatory damages and $5,000 in punitive damages. The district court entered judgment in these amounts but declined to enter any individual injunctive relief.

13. *Sergeant James NeSmith*—The jury found for NeSmith on his claims that he was discriminated against because of race with regard to promotions, assignments or transfers, and discipline. The jury awarded him $10,000 in compensatory damages and $10,000 in punitive damages on his unclassified position non-selection claim. The jury also awarded him $40,000 in compensatory damages and $8,000 in punitive damages on his discriminatory assignment or transfer claim, and an additional $30,000 in compensatory damages and $7,000 in punitive damages on his discriminatory discipline claim. The district court also awarded NeSmith $2,156.83 in back pay to compensate him for wages he would have received had he been promoted to the position of unclassified captain in March 1993, and ordered the Defendants to provide NeSmith with the pay grade, employee benefits, and seniority he would have earned had he been promoted to the position of unclassified captain on March 1, 1993.

14. *Sergeant Joan Paschal*—The jury found for Paschal on her claim that she was not considered for appointment to the unclassified positions of captain or major due in whole or in part to her race, but it awarded her no monetary relief, and the district court ordered no injunctive relief.

5

15. *Sergeant Heidi Schaefer*—The jury found that Schaefer was not considered for appointment to the unclassified positions of captain or major on account of her race and that she was discriminated against because of race with respect to assignments or transfers. The jury also concluded that Schaefer had not been permitted to compete in the promotional process for the rank of classified lieutenant in 1993 because of her race. Accordingly, the jury awarded Schaefer $10,000 in compensatory damages and $5,000 in punitive damages for the assignment or transfer claim, and an additional $10,000 in compensatory damages and $5,000 in punitive damages for the promotional process claim.

16. *Sergeant Robert Smith*—The jury found that Smith was not reclassified as a classified sergeant until July 1994, and was not permitted to compete in 1993 in the promotional process for the position of classified lieutenant because of his race. Although the jury found that Smith was the victim of discrimination when he was not considered for appointment to the unclassified positions of captain or major, it concluded that his failure to be selected was not the result of discrimination. The jury also determined that Smith was not discriminated against with respect to assignments or transfers. As for his reclassification claim, the jury found that Smith should have been reclassified as a classified sergeant in November 1992 and awarded him $10,000 in compensatory damages and $0 in punitive damages. As for his promotional process claim, the jury awarded Smith $10,000 in compensatory damages and $5,000 in punitive damages. Finally, the district court ordered the Defendants to provide Smith with the pay grade, employee benefits, and seniority he would have achieved had he been promoted to the rank of classified sergeant on November 1, 1992.

17. *Sergeant Benjamin Steele*—The jury found that while Steele was not considered for appointment to the unclassified positions of captain or major on account of race, his failure to be selected for these positions was not due to his race. The jury did find that Steele was discriminated against with respect to assignments or transfers but not with respect to reclassifications. Based on finding discrimination on Steele's assignment or transfer claims, the jury awarded Steele $10,000 in compensatory damages and $5,000 in punitive damages.

18. *Corporal Robert Upshaw*—Finally, the jury found that while Upshaw was not considered for appointment to the unclassified positions of captain or major because of his race, his failure to be selected for these positions was not on account of race. The jury did find, however, that Upshaw's rank of classified lieutenant was not restored after his voluntary demotion to deputy because of his race. As for this claim, the jury awarded Upshaw $20,000 in compensatory damages but no punitive damages. The district court also ordered Defendants to promote Upshaw to the rank of classified lieutenant retroactive to March 1, 1993, and to adjust his pay grade, employee benefits, and seniority accordingly.

The district court decertified the class after trial observing that because of the different types of discrimination claims alleged, Plaintiffs did not satisfy the commonality and typicality prerequisites of a class action. The court also expressed doubt as to whether the members of the class were really so numerous as to warrant class certification. In January 1997, the district court denied the Defendants' motion for judgment as a matter of law and entered final judgment for the Plaintiffs.

6

II.

A brief description of the structure, function, and hierarchy of the Fulton County Government offices at issue is necessary to understand the resolution of this appeal. We begin with Defendant Fulton County which is administered by the Fulton County Board of Commissioners ("Board"), in turn made up of seven Commissioners elected by the voters of Fulton County to four-year terms. The Board sets Fulton County governmental policy and approves departmental budget requests. Fulton County voters elect the Sheriff every four years. On December 14, 1992, defendant Jacquelyn Barrett took office as the Sheriff of Fulton County, Georgia. As of August 1993, the Fulton County Sheriff's Department had 629 sworn law enforcement officers. Among those officers, 521, or 83%, were black.

The Sheriff's Department, like all other Fulton County departments, uses the services of the Fulton County Personnel Department. The Personnel Board is appointed by the Board of Commissioners and is the major decision-making authority within the Personnel Department. The Personnel Department is responsible for the County's human resources system, which designates the positions of Fulton County employees as being either "classified" or "unclassified." Classified jobs comprise the vast majority of the jobs in the Sheriff's Department and are explicitly subject to civil service-type protections.[8] For those jobs, the Personnel Department advertises the positions available, noting the minimum qualifications required for each, and thereafter processes all applications. In reviewing them, the Board determines whether an applicant meets the "published" minimum requirements. If the applicant does not meet the requirements the Board notifies the applicant of this finding and the applicant is given thirty days to provide the Board with additional information and contest the finding. But, if the Personnel Board finds that an applicant meets the minimum qualifications, the applicant receives notification of the next scheduled promotions test. The Personnel Board then administers a written test. If an applicant passes that, he is eligible to take an oral examination given by high-ranking officers in the Sheriff's Department. Thereafter, if an applicant passes both the written and oral

---

[8]The highest-ranking classified position is captain.

tests, his name appears on a list of eligible applicants ranked by examination scores. When an opening for a classified position arises, the Sheriff promotes an individual from the list in rank designated order. Each list expires after six months, and the officers who are not promoted from the list but wish to be considered for future promotions must go through the entire process again.

Unclassified jobs, in contrast, are more like political appointments. In Sheriff Barrett's administration, they consist of positions with the rank of captain or higher. Notably, a department head such as Sheriff Barrett with appointment authority does not have to advertise for open unclassified positions, is not required to employ the services of the Personnel Department, and can dismiss an unclassified employee at her pleasure.

The Personnel Board hears appeals of classified employees who have suffered demotions, suspensions, or dismissals when the employee alleges that the action was taken for personal, political, or religious reasons. The Personnel Board also considers "reclassification" applications.[9] The Grievance Review Committee hears classified and unclassified employees' appeals of employment decisions made by superiors. Its review of classified employees' grievances, however, is limited to cases not falling under the jurisdiction of the Personnel Board. This Committee is comprised of two Fulton County non-supervisory employees, two members drawn from the supervisory ranks or management appointed by the Board of Commissioners, and one person who is not employed by Fulton County and who is selected by the other members. According to Committee procedure, an employee's chain of command first reviews and considers a grievance. If the employee cannot establish a satisfactory resolution through the chain of supervision, the grievance is passed to the Personnel Department which logs in the grievance. The Personnel Department then forwards the complaint to the Grievance Review Committee Chairperson who schedules a hearing. After the Grievance Review Committee conducts a hearing, the Committee may recommend settlement orders which

---

[9]Generally, a department head seeks reclassification of a subordinate's classified rank when she believes the employee is performing the duties of a higher-ranking position than the one actually held. An employee may also request that her department head seek reclassification on her behalf, but Department sponsorship is generally required for successful reclassification.

are subject to approval by the County Manager. Elected officials such as Sheriff Barrett are not obligated to accept and implement the recommendations of the Grievance Review Committee, but, as a practical matter, they usually do.

Finally, the Fulton County Sheriff's Department consists of several Divisions. The Jail Division runs the Fulton County Jail and administers prisoner transfers. The Jail Division is by far the largest of the Sheriff's Departments, with over 500 employees. Next in size is the Court Services Division which provides security to Fulton County courthouses and individual courtrooms. Other Divisions include the Service Division, the Office of Professional Standards, and the Bonding Division. The Service Division is responsible for the service of warrants and civil processes. The Office of Professional Standards handles investigations into alleged wrongdoings by Sheriff's Department employees and conducts background investigations on new applicants. The Bonding Division manages the Department's interaction with bonding companies, as well as the whole bonding process.

Upon taking office, Sheriff Barrett created the Community Relations Division and the Research and Planning Division. The Community Relations Division performs various crime prevention activities, and serves as a liaison between the Sheriff and the community. The Research and Planning Division studies issues that the Sheriff believes will be important and prepares the Department's Policy and Procedures Manual.

III.

On appeal we consider six broad challenges to the proceedings below: first, that the district court erred in denying qualified immunity to Sheriff Barrett; second, that it erred in concluding Fulton County is liable under section 1983; third, that the court should have granted Defendants' motion to sever Plaintiffs' individual claims; fourth, that the district court wrongfully admitted into evidence certain statistical and non-statistical evidence that was both irrelevant and unfairly prejudicial; fifth, that the court erred in its jury instructions; and finally, that the trial court erroneously denied Defendants' motions for judgment as a matter

9

of law because the evidence was plainly insufficient to support any of the individual Plaintiffs' claims. We

consider each claim in turn.

A.

We examine first Sheriff Barrett's belated argument raised for the first time in the Defendants' motion

for judgment as a matter of law that she is protected, in her individual capacity, from civil damages by the

doctrine of qualified immunity because the Plaintiffs failed to demonstrate that her conduct violated their

clearly established statutory or constitutional rights.[10]

We review *de novo* the district court's denial of qualified immunity. *Belcher v. City of Foley,* 30 F.3d

1390, 1395 (11th Cir.1994). Under qualified immunity, "government officials performing discretionary

functions generally are shielded from liability for civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have known."

*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "For the law to be clearly

established to the point that qualified immunity does not apply, the law must have earlier been developed in

such a concrete and factually defined context to make it obvious to all reasonable government actors, in the

defendant's place, that 'what he is doing' violates federal law." *Lassiter, v. Alabama A&M Univ., Bd. of*

*Trustees,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640,

107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). And " '[f]or qualified immunity to be surrendered,

pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the

conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal

---

[10]Qualified immunity is an affirmative defense which must be pled by the defendant. *Gonzalez v. Lee County Housing Auth.,* 161 F.3d 1290, 1294 (11th Cir.1998). Here, Sheriff Barrett adequately pled the defense of qualified immunity in the Defendants' answer to Plaintiffs' complaint, but notably did not pursue the defense further by either a pretrial motion to dismiss or for summary judgment, thereby losing the protection from litigation, including discovery and trial, qualified immunity may afford government actors. *See Hill v. Dekalb Regional Youth Detention Center,* 40 F.3d 1176, 1184 (11th Cir.1994). Not until Defendants' motion for judgment as a matter of law, raised initially at the close of the Plaintiffs' case, did Sheriff Barrett again raise the defense of qualified immunity.

law in the circumstances.' " *Jenkins by Hall v. Talladega City Bd. of Educ.,* 115 F.3d 821, 823 (11th Cir.1997) (en banc) (quoting *Lassiter,* 28 F.3d at 1150).

In analyzing a defense of qualified immunity, we first consider whether Sheriff Barrett was acting within the scope of her discretionary authority when the alleged wrongful acts occurred. *Evans v. Hightower,* 117 F.3d 1318, 1320 (11th Cir.1997). If Sheriff Barrett has met this burden, the Plaintiffs must then demonstrate that she violated clearly established law based upon objective standards. *Id.*

On this record, it is undisputed that the Sheriff was acting within the scope of her discretionary authority when she made the various employment decisions at issue. Moreover, there can be no doubt that in December 1992, when Sheriff Barrett assumed office, it was clearly established that intentional discrimination in the workplace on account of race violated federal law. *See Smith v. Lomax,* 45 F.3d 402, 407 (11th Cir.1995); *Yeldell v. Cooper Green Hosp., Inc.,* 956 F.2d 1056, 1064 (11th Cir.1992) (citing *Washington v. Davis,* 426 U.S. 229, 239-41, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976)); *Busby v. City of Orlando,* 931 F.2d 764, 775 (11th Cir.1991) (same); *Brown v. City of Ft. Lauderdale,* 923 F.2d 1474, 1478 (11th Cir.1991) (same).

Sheriff Barrett, however, relying on *Foy v. Holston,* 94 F.3d 1528 (11th Cir.1996), argues that she is entitled to qualified immunity because she had a "substantial lawful motive" for making each of the employment decisions in question. In *Foy,* the parents of children removed or threatened with removal from a religious community[11] sued the responsible state social service employees under section 1983 claiming that the state employees acted out of hostility toward the parents' religious beliefs. The social service employees moved for summary judgment claiming qualified immunity. We held that the defendants were entitled to qualified immunity because "it was [not] already clearly established when [the employees] acted that no child custody worker could lawfully act-that is, do what Defendants did-to protect children in the circumstances of this case if the worker also acted, in part, out of hostility toward the parent's religion." *Id.* at 1536.

---

[11]The plaintiffs were married couples who belonged to Christ Temple Church and lived in "The Holyland"—property owned by the Church.

Subsequently, we have observed that the holding in *Foy* "rested primarily on the existence of an *indisputable and adequate lawful motive* on the part of the social service employees such that reasonable officials would disagree as to the legality of their conduct." *Johnson v. City of Ft. Lauderdale,* 126 F.3d 1372, 1379 (11th Cir.1997) (emphasis added).

In this case, however, the jury squarely found that Sheriff Barrett intentionally discriminated against many white law enforcement officers on account of race, and, in so doing, unambiguously rejected her proffered non-discriminatory reasons for her employment decisions. *Foy,* therefore, is inapposite. Based on a painstaking review of this record, we are satisfied that a reasonable jury could find Sheriff Barrett intentionally made race-based employment decisions in violation of Plaintiffs' clearly established rights. As a result, the district court properly denied the Defendants' motion for judgment as a matter of law because of qualified immunity. *See Von Stein v. Brescher,* 904 F.2d 572, 578 (11th Cir.1990) ("[I]f there is substantial evidence opposed to the motions [for judgment as a matter of law], that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.' ") (quoting *Boeing Co. v. Shipman,* 411 F.2d 365, 374-75 (5th Cir.1969) (en banc)).

B.

Next, the Defendants argue that the district court erred in denying their motion for judgment as a matter of law as to Fulton County's liability under section 1983. Specifically, they claim that Sheriff Barrett did not have "final policy-making authority" over personnel decisions and that Fulton County had no "policy or custom" of employment discrimination, thereby foreclosing County liability for any of the many challenged employment decisions. Whether the County may properly be held liable under section 1983 makes no practical difference to the outcome of the case for three independent reasons. First, to the extent that Plaintiffs complied with Title VII's preconditions to suit, the County may properly be held liable under

12

Title VII for all of the claims Plaintiffs press under section 1983.[12] Second, none of the Plaintiffs' total damages awards exceeded the relevant statutory limitation of $300,000 imposed by Title VII.[13] Therefore, we need not consider whether the awards would be permissible under section 1983. Third, as Plaintiffs conceded before the district court, they may not be awarded punitive damages against the County.[14] *See Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 258-61, 101 S.Ct. 2748, 2755-56, 69 L.Ed.2d 616 (1981); *Healy v. Town of Pembroke Park,* 831 F.2d 989, 991 (11th Cir.1987). Because Title VII provides an alternative basis for liability in this case, we need not, and will not, address the purely academic question of whether the County could also properly have been found liable under section 1983.

C.

Defendants also broadly allege that the district court erred in so far as it tried each of the Plaintiffs' claims together. After discovery, Defendants moved to sever Plaintiffs' individual claims of discrimination contending that the joint trial of these claims would confuse the jury and unfairly prejudice their defense. The district court rejected this motion. We review a district court's joinder of Plaintiffs' claims and denial of severance for abuse of discretion. *Nor-Tex Agencies, Inc. v. Jones,* 482 F.2d 1093, 1100 (5th Cir.1973).[15] Although we recognize that unfair prejudice may result from trying together the claims of multiple Plaintiffs

---

[12]As we have noted previously, the jury did not specify on which theory of liability it grounded its award of damages.

[13]42 U.S.C. § 1981a(b)(3)(D) provides that the total amount recoverable for each complaining party under Title VII for compensatory and punitive damages shall not exceed $300,000, where the employer has more than 500 employees. Here, the Sheriff's Department employs greater than 500 employees, and the highest damages award was $300,000 for Major Alexander, $250,000 in compensatory damages and $50,000 in punitive damages. Compensatory damages do not include backpay or any other relief authorized under section 706(g) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(g). *See* 42 U.S.C. § 1981a(b)(2).

[14]Plaintiffs also cannot recover punitive damages against Sheriff Barrett in her official capacity, *see Colvin v. McDougall,* 62 F.3d 1316, 1319 (11th Cir.1995), because Plaintiffs' suit against Sheriff Barrett in her official capacity is the functional equivalent of suing the County, *see Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985).

[15]The Eleventh Circuit has adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

alleging different types of discrimination, we discern no abuse of discretion in the district court's decision to join the Plaintiffs' claims in this case.

Among other things, the Federal Rules of Civil Procedure provide that "[a]ll persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action." Fed.R.Civ.P. 20(a). *See also Grayson v. K Mart Corp.,* 79 F.3d 1086, 1097 (11th Cir.1996). A party seeking joinder of claimants under Rule 20 must establish two prerequisites: 1) a right to relief arising out of the same transaction or occurrence, or series of transactions or occurrences, and 2) some question of law or fact common to all persons seeking to be joined. *See* Fed.R.Civ.P. 20(a). Plainly, the central purpose of Rule 20 is to promote trial convenience and expedite the resolution of disputes, thereby eliminating unnecessary lawsuits. *See Mosley v. General Motors Corp.,* 497 F.2d 1330, 1332 (8th Cir.1974). The Federal Rules, however, also recognize countervailing considerations to judicial economy. Rule 42(b), for example, provides for separate trials where the efficiency of a consolidated trial is outweighed by its potential prejudice to the litigants. *See* Fed.R.Civ.P. 42(b); *Grayson,* 79 F.3d at 1097. The Supreme Court has instructed the lower courts to employ a liberal approach to permissive joinder of claims *and* parties in the interest of judicial economy: "Under the Rules, the impulse is towards entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers v. Gibbs,* 383 U.S. 715, 724, 86 S.Ct. 1130, 1137, 16 L.Ed.2d 218 (1966).

In determining what constitutes a transaction or occurrence for the purposes of Rule 20(a), courts have looked for meaning to Fed.R.Civ.P. 13(a) governing compulsory counterclaims. *See Mosley,* 497 F.2d at 1333. For the purposes of Rule 13(a), " '[t]ransaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Moore v. New York Cotton Exchange,* 270 U.S. 593, 610, 46 S.Ct. 367, 371, 70

14

L.Ed. 750 (1926) (interpreting the compulsory counterclaim provision of former Equity Rule 30). Accordingly, "all 'logically related' events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence." *Mosley,* 497 F.2d at 1333. Several courts have concluded that allegations of a "pattern or practice" of discrimination may describe such logically related events and satisfy the same transaction requirement. In *Mosley,* perhaps the leading case on the joinder of Title VII plaintiffs under Rule 20, *see* 4 Lex K. Larson, *Employment Discrimination,* § 78.05, at 28-29 (2d ed.1994), ten black plaintiffs alleged that General Motors had a general policy of discrimination against black employees. The trial court had ordered the severance of the claims, concluding that the allegations presented a variety of issues and had little relationship to one another. *Mosley,* 497 F.2d at 1332. The Eighth Circuit reversed the trial court's order to sever plaintiffs' claims, concluding that, based on its reading of Rule 20, the General Motors policy "purportedly designed to discriminate against blacks in employment ... [arose] out of the same series of transactions and occurrences." *Id.* at 1334. The court held that "[s]ince a 'state-wide system designed to enforce the registration laws in a way that would inevitably deprive colored people of the right to vote' was determined to arise out of the same series of transactions or occurrences, we conclude that a company-wide policy purportedly designed to discriminate against blacks in employment ... arises out of the same series of transactions or occurrences" *Id.* at 1333-34 (quoting *United States v. Mississippi,* 380 U.S. 128, 142, 85 S.Ct. 808, 815-16, 13 L.Ed.2d 717 (1965)). *See also Blesedell v. Mobil Oil Co.,* 708 F.Supp. 1408, 1422 (S.D.N.Y.1989) ("A company-wide policy purportedly designed to discriminate against females in employment arises out of the same series of transactions or occurrences."); *King v. Pepsi Cola Metro. Bottling Co.,* 86 F.R.D. 4, 6 (E.D.Pa.1979) (noting that allegations of a "pervasive policy of discrimination" by the employer bring the "complaints of individual Plaintiffs under the rubric of the 'same series of transactions' "); *Vulcan Soc'y of Westchester Cty. v. City of White Plains Fire Department,* 82 F.R.D. 379, 387 (S.D.N.Y.1979) (stating that transaction requirement met where Plaintiffs and would-be Plaintiffs

15

claimed discriminatory policies and practices which included a series of exams allegedly used to discriminate against blacks).

The second prong of Rule 20 does not require that *all* questions of law and fact raised by the dispute be common, but only that *some* question of law or fact be common to all parties. *See Mosley,* 497 F.2d at 1334. Several courts have found that the question of the discriminatory character of Defendants' conduct can satisfy the commonality requirement of Rule 20. *See Mosley,* 497 F.2d at 1334 (finding that whether the threat of a racially discriminatory policy hangs over a racial class is a question of fact common to all the members of the class); *Blesedell,* 708 F.Supp. at 1422 (noting that "[i]n employment discrimination cases under Title VII, courts have found that the discriminatory character of a defendant's conduct is common to each plaintiff's recovery"); *cf. Grayson,* 79 F.3d at 1095-96 (suggesting that "a unified policy, plan, or scheme of discrimination" can satisfy Rule 20's commonality requirement).

On the other hand, the prejudicial effects of other witnesses' alleged discriminatory experiences may outweigh their probative value where, for example, the alleged discrimination occurs during different time periods, *see, e.g., Annis v. County of Westchester,* 136 F.3d 239, 247 (2d Cir.1998); *Williams v. The Nashville Network,* 132 F.3d 1123, 1130 (6th Cir.1997), different supervisors make the challenged decisions, *see, e.g., Annis,* 136 F.3d at 246-47; *Williams,* 132 F.3d at 1130; *Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1221 (5th Cir.1995), or the alleged discrimination happens at geographically removed places, *see, e.g., Williams,* 132 F.3d at 1130; *Mooney,* 54 F.3d at 1221. None of these concerns is presented here.

In this case, the district court did not abuse its discretion in finding that the Plaintiffs satisfied both requirements for joinder. As for the first requirement, all of the Plaintiffs' claims stem from the same core allegation that they were subject to a *systemic* pattern or practice of race-based discrimination against white law enforcement officers by Sheriff Barrett in her first year in office. Plaintiffs all seek relief based on the same series of discriminatory transactions by the same decision-maker in the same department during the same short time frame. As for the second requirement, the discriminatory character of Defendants' conduct

16

is plainly common to each plaintiff's recovery. The fact that the Plaintiffs suffered different effects—in this case, discrimination in promotions, transfers, assignments, or discipline—from the alleged policy of discrimination did not preclude the trial court from finding a common question of law and fact. *See Mosley,* 497 F.2d at 1334; *Blesedell,* 708 F.Supp. at 1422.

Alternatively, the Defendants argue that even if the district court did not abuse its discretion in finding proper joinder under Rule 20(a), it did err in failing to sever the Plaintiffs' cases for trial under Fed.R.Civ.P. 42(b).[16] *Grayson,* 79 F.3d at 1097. As Rule 42(b) requires the district court to balance considerations of convenience, economy, expedition, and prejudice, the decision to order separate trials naturally depends on the peculiar facts and circumstances of each case. Again, we disturb a district court's decision not to order separate trials only upon a showing of abuse of discretion. *See Bailey v. Board of County Comm'rs,* 956 F.2d 1112, 1127-28 (11th Cir.1992). We can discern no abuse of discretion here.

Defendants suggest that there was no way to try together the individual claims of the eighteen Plaintiffs, each involving different work histories, employment decisions and prayers for relief, without unfairly prejudicing their defense and confusing the jury. While we acknowledge the real potential for confusion among jurors and for unfair prejudice to a defendant where there are large numbers of Plaintiffs, claims, and defenses, and urge care in joining together in one case multiple claims and multiple claimants, we conclude that in this case the potential for prejudice was minimized because of the core similarities in Plaintiffs' claims. As we have stated, the claims all center on the core allegation of a systemic pattern of race-based discrimination against white law enforcement officers instigated by Sheriff Barrett during her first year in office. Moreover, the Plaintiffs' specific claims also overlap substantially. Each plaintiff, with the

---

[16]Rule 42(b) provides in full: "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States." The trial court likewise has discretion under Rule 20(b) to order separate trials "to prevent delay or prejudice," but this was not argued by appellants' in their brief, and therefore we will not address that rule here.

17

exception of Major A.M. Alexander, challenged on the grounds of race discrimination Sheriff Barrett's alleged failure to consider him or her for appointment to unclassified positions. Thirteen Plaintiffs claimed the Sheriff discriminated against each of them in assignments or transfers. In addition to these two main claims, three of the Plaintiffs alleged that they were discriminated against with respect to reclassifications, two claimed that they were discriminated against when Sheriff Barrett failed to restore their rank after voluntary demotions, and two claimed they were disciplined in a discriminatory manner. Furthermore, several of the claims—discriminatory denial of reclassification, discriminatory denial of restoration of rank, and denial of promotion claims—logically relate or overlap. Finally, each of the Plaintiffs' claims and the evidence of discrimination undoubtedly are relevant to every other plaintiff's core allegation of systemic discrimination. *See Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 876, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984) (explaining that evidence of pervasive discrimination against others is admissible if such evidence is similar to the complainant's experience and tends to establish that "racial discrimination was the company's standard operating procedure-the regular rather than the unusual practice") (quoting *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977)); *Mooney,* 54 F.3d at 1221 (holding that "to show relevancy, Trial Plaintiffs had to show that the proffered anecdotal witnesses were sufficiently similar to themselves so that the witnesses' testimony would have a tendency to show 'standard [discriminatory] operating procedure' and a 'regular rather than unusual practice' of discrimination.") (quoting *International Brotherhood of Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1855).

Given the common core of allegations, the substantial overlap of the particular claims, and the logical interconnection of several of the different forms the alleged discrimination took, we are satisfied that the district court did not abuse its discretion in finding that the efficiency of a consolidated trial outweighed the potential for unfair prejudice or jury confusion.

18

While the Defendants also claim that the verdict itself reflects that the joint trial of the eighteen Plaintiffs hopelessly confused the jury, requiring remand and severance, we cannot agree. The verdict actually delivered by the jury, when considered in its entirety, suggests to the contrary that the jury discerned the strengths and weaknesses of the claims of each individual plaintiff. Indeed, the jury denied relief on all claims concerning promotion to unclassified major.[17] The jury also found against two of the four Plaintiffs who claimed that they should have been reclassified,[18] and against five of the ten Plaintiffs who alleged that they were not *selected* to unclassified captain positions due in part or in whole to their race.[19] *See United States v. Bermea,* 30 F.3d 1539, 1574 (5th Cir.1994) (stating that "[t]he mixed verdicts returned with respect to [the two of the Defendants] demonstrate that the jury was not confused"); *United States v. LaSpesa,* 956 F.2d 1027, 1032 (11th Cir.1992) (finding no error in the district court's denial of motion for severance because, among other reasons, "the jury's mixed verdict showed, at least to some degree, that it effectively linked the evidence to the appellants and 'refuted any allegation of compelling prejudice' ") (quoting *United States v. Hernandez,* 921 F.2d 1569, 1578 (11th Cir.1991); *United States v. Perlstein,* 120 F.2d 276, 281 (3d Cir.1941)) (finding that the jury was not confused by two conspiracies being tried together because they acquitted one defendant and convicted the other). On this record, we cannot say that the district court abused its discretion in not severing Plaintiffs' individual claims.

D.

Next, the Defendants challenge the district court's evidentiary rulings concerning the admissibility of statistical evidence designed to show that white officers were underrepresented in the Sheriff's department,

---

[17]While the jury found that all Plaintiffs, except for Major Alexander, were not considered for promotion to the unclassified position of major because of race, it rejected all of their claims that they were not actually selected for the position because of race.

[18]The jury found in favor of Jimmy Bolt and Robert Smith, and against Joseph Bantin, and Benjamin Steele.

[19]The jury found in favor of Denise Brooks, Robert Fox, Gary Gettis, Carolyn Masson, and James NeSmith. The jury found against Charles Alexander, Joseph Bantin, Jimmy Bolt, Benjamin Steele, and Robert Upshaw.

and non-statistical evidence offered to show a custom or practice of discrimination against white employees by Fulton County. Again, we review the district court's evidentiary rulings for abuse of discretion, *see Judd v. Rodman,* 105 F.3d 1339, 1341 (11th Cir.1997), and reverse only if the moving party establishes that the ruling resulted in a "substantial prejudicial effect," *Piamba Cortes v. American Airlines, Inc.,* 177 F.3d 1272, 1305 (11th Cir.1999) (citation and internal quotation marks omitted); *see also* Fed.R.Evid. 103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected...."); Fed.R.Civ.P. 61 (An erroneous evidentiary ruling is not subject to reversal unless refusal to take such action is "inconsistent with substantial justice."). When employing an abuse of discretion standard, "we must affirm unless we at least determine that the district court has made a clear error of judgment, or has applied an incorrect legal standard." *SunAmerica Corp. v. Sun Life Assurance Co. of Canada,* 77 F.3d 1325, 1333 (11th Cir.1996) (citations and internal quotation marks omitted). While we think the district court erred in admitting both types of evidence, we are satisfied that the error did not result in a substantial injustice to the Defendants.

First, the Defendants challenge the district court's decision to admit five pieces of statistical evidence: (1) testimony concerning and comparing the racial composition of the Sheriff's Department to the general demographics of an eight-county Metropolitan Atlanta area; (2) evidence regarding changes in the overall racial composition of the Sheriff's Department and the workforce in Fulton County over two decades; (3) evidence establishing the change in the racial composition of the general workforce of Fulton County government from the mid-1970's to the present; (4) testimony regarding the increase in the number of minority employees in Fulton County government from 1985 to 1995 and the concomitant decrease in the number of white employees; and finally, (5) evidence that the overall composition of the County workforce had increased from 22.1% minority in 1972 to 55.9% in 1989, that the percentage of black County Department Heads had increased from zero in 1972 to 40 to 50% in 1990, and that the number of black

members of the Board of Commissioners had increased from zero of three to five of seven between 1972 and 1990.

We begin by considering the relevance of the first two pieces of evidence generally comparing the racial composition of the Sheriff's Department to the demographics of Fulton County and the eight-county metropolitan Atlanta area to show discrimination by the Sheriff's Department. On occasion, we have regarded as probative of class-based disparate treatment statistics showing that a given minority is "underrepresented" in the work force by comparison with the *general* population. *See, e.g., United States v. City of Miami,* 614 F.2d 1322, 1339 (5th Cir.1980) (comparing numbers of Spanish-surnamed City employees with Spanish-surnamed members of the Miami labor force), *reh'g granted on other grounds,* 664 F.2d 435 (5th Cir.1981). The usefulness of such statistical comparisons, however, is generally limited to claims involving jobs with low skill levels where the applicant pool can be considered roughly coextensive with the general population. *See, e.g., City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 501, 109 S.Ct. 706, 726, 102 L.Ed.2d 854 (1989) (explaining that "[i]n the employment context, we have recognized that for certain *entry* level positions or positions requiring minimal training, statistical comparisons of the racial composition of an employer's work force to the racial composition of the relevant population may be probative of a pattern of discrimination. But where *special* qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task") (citations omitted) (emphasis added); *Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 2742 n. 13, 53 L.Ed.2d 768 (1977) (noting that "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value"); *International Brotherhood of Teamsters,* 431 U.S. at 338 n. 17, 97 S.Ct. at 1856 n. 17 (considering as evidence of intentional discrimination statistics comparing the percentage of black residents in various cities with the percentage of blacks hired as line drivers in those cities). *See also Peightal v. Metropolitan Dade County,*

21

26 F.3d 1545, 1553 (11th Cir.1994) (noting that "in order to determine discriminatory exclusion, unskilled positions are compared to a different statistical pool than are jobs requiring special skills"). In a disparate treatment case where low skill jobs are not at issue, "the statistical evidence must be finely tuned to compare the employer's relevant workforce with the qualified populations in the relevant labor market." *Forehand v. Florida State Hosp. at Chattahoochee,* 89 F.3d 1562, 1575 (11th Cir.1996) (disparate treatment class action) (citation and internal quotation marks omitted).

In this case, the Plaintiffs consist of current or former sworn law enforcement officers in the Fulton County Sheriff's Department. Plainly, these jobs are not entry level and are not of a "low skill level" within the meaning of *International Brotherhood of Teamsters* and *Hazelwood.* The relevant labor pools undoubtedly are narrower than Plaintiffs' vague comparison to general population figures would suggest, and the comparisons must be more subtle and nuanced. Indeed, for the unclassified captain and major positions, Sheriff Barrett appointed officers with the rank of classified sergeant or higher (in addition to some outside hires). The relevant labor market for these positions, therefore, consisted of all law enforcement officers with at least the rank of sergeant. For reclassifications, the relevant population was comprised of all law enforcement officers eligible for reclassification. For transfers and assignments, the relevant market consisted of all law enforcement officers eligible for the transfer or assignment in question. And for disciplinary actions, the relevant pool was made up of law enforcement officers who had committed the same or similar offenses as the officer who was subject to discipline. Because the general population is not readily qualified for the law enforcement positions at issue in the case, the Plaintiffs cannot show discrimination in hiring simply by comparing the percentage of white sworn officers in the Fulton County Sheriff's Department with the percentage of white residents of Fulton County or metropolitan Atlanta. To show discrimination in hiring for these law enforcement positions, the Plaintiffs would instead have to show a disparity between the percentage of whites hired as law enforcement officers and the percentage of whites in the relevant labor pool of qualified individuals. Because Plaintiffs' statistical evidence attempts to show discrimination just by

22

looking at the general population rather than at the *relevant* skilled labor pool, the evidence has no real probative value of whether, within the relevant labor pool, the Sheriff's Department discriminated on the basis of race. As a result, we think the first two pieces of statistical evidence should have been excluded by the trial court.

The remaining three pieces of statistical evidence showing the increase in the number of minority employees of Fulton County government also are not relevant to the allegations that the Sheriff discriminated in this case. The evidence was offered to suggest the Sheriff's Department was somehow influenced and encouraged by a larger County-wide policy of discriminating against whites. But this evidence is not probative of a custom or policy in the Sheriff's department for two reasons. First, the statistical evidence reflecting the rising number of minority employees in the County workforce does not alone tend to establish that Fulton County officials initiated and maintained a custom of discrimination against their white employees. It does not ineluctably follow that a rise in the number or percentage of minority employees in the County was caused by a custom or policy of discrimination maintained by County officials. Second, even if a policy or custom of discrimination by the County was somehow demonstrated or even suggested by the rising number of minorities in the County workforce, this evidence standing alone has no bearing on whether such a policy or custom of discrimination was also maintained by the Sheriff's Department. Notably, the Plaintiffs have not shown that the County participated in any way in the employment decisions made by the Sheriff and therefore cannot establish any connection between the hiring decisions and policies of the County and those of the Sheriff's Department. As a result, evidence of the racial composition of Fulton County government employees, even if it suggests a policy of racial discrimination by the County, does not make a similar pattern or policy of racial discrimination by the Sheriff's Department against its employees any more or less likely.

Although we believe that the district court erroneously admitted the challenged statistical evidence, we are satisfied, after a thorough review of the record, that the error does not warrant reversal for two reasons.

23

First, the district court adequately instructed the jury on the proper weight to be given to the evidence thereby ameliorating any prejudicial effect the evidence might otherwise have had. In instructing the jury on how to evaluate the statistical evidence, the district court stated: "[I]f you find that the Plaintiffs demonstrate a racial disparity, you may consider whether factors other than race account for the disparity and you may consider whether such disparity, if any, caused the specific personnel decisions about which they complain."

The district court's instruction to consider whether factors other than race account for any statistical disparity, largely cures any error caused by admitting the first two pieces of evidence comparing the racial composition of the Sheriff's Department with the non-relevant general populations of Fulton County and the Metropolitan Atlanta area. The instruction properly focused the jury on the question of whether the statistical disparities were the result of race-based discrimination in the Sheriff's Department or the result of a racially skewed qualified labor pool. By focusing the jury on this critical question of whether the statistical disparities showed that similarly situated black and white individuals were treated differently by the Sheriff's Department—a question in no way answered by the statistical evidence—the district court ensured that the jury did not accord the statistical evidence weight it was not due.

Moreover, as for the remaining statistical evidence examining the racial composition of the Fulton County government workforce, we are satisfied that the district court's instruction to the jury to consider whether the racial disparity reflected in the statistics *caused* the specific personnel decisions challenged in this case cured any potential injustice caused by the district court's erroneous admission of this evidence. Again, the district court's instruction emphasized the need for the jury to find a causal link between the statistical disparities and the decisions made by Sheriff Barrett. No such causal link between the County and the Sheriff was presented. The district court's instruction, by focusing the jury on the need to find such a link before giving the statistical evidence weight, again ensured that the jurors would not give the evidence weight it did not deserve.

24

Simply put, the district court "sufficiently instructed the jury so that the jurors understood the issues and were not misled" by the statistical evidence erroneously admitted. *Carter v. DecisionOne Corp.,* 122 F.3d 997, 1005 (11th Cir.1997) (citation omitted). *See also Nettles v. Electrolux Motor AB,* 784 F.2d 1574, 1581 (11th Cir.1986) (holding that although the district court erroneously admitted certain evidence, the error was not grounds for reversal because the district court correctly focused the jury's attention on the relevant issue making it "highly unlikely" that the jury gave the evidence undue consideration).

Second, although we do find the admissible evidence presented at trial was insufficient to sustain several of the jury's verdicts,[20] the verdicts that we do sustain were the product of such one-sided evidence that we find it very unlikely, indeed remote, that the jury could have been swayed erroneously by the wrongfully admitted evidence. *See United States v. Mendez,* 117 F.3d 480, 486 (11th Cir.1997) (finding harmless the district court's erroneous introduction of evidence because of the ample evidence supporting the jury's verdict); *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.,* 630 F.2d 250, 271 (5th Cir.1980) (upholding a jury verdict despite the district court's erroneous admission of evidence because "[i]n light of our determination that the evidence was sufficient to support the jury's finding of an agency relationship even without the challenged testimony, in view of the minor importance of the inadmissible matter, and in light of the district court's general instructions to the jury, we conclude that the inadmissible matter had no prejudicial impact upon the final outcome of this case"). In six of the nine verdicts that we uphold, Defendants offered *no* legitimate non-discriminatory reason for their disparate treatment of each plaintiff when compared to the identified similarly situated black comparator.[21] As for the remaining three verdicts, Defendants presented either patently illogical rationales for their disparate treatment of each plaintiff,[22] or the

---

[20]*See infra* section IV.

[21]This was the case with the discriminatory discipline claim of James NeSmith, the failure to promote claims of Robert Fox, Gary Gettis, Carolyn Masson, and James NeSmith, and the discriminatory reclassification claim of Robert Smith. *See* discussion *infra* sections IV-A2, IV-B2-5, and IV-D.

[22]This was the case with the discriminatory reclassification claim of Jimmy Bolt. *See* discussion *infra* section IV-D.

evidence presented by the Plaintiffs was clearly sufficient to support the jury's conclusion that the non-discriminatory rationale given by Defendants was pretextual.[23]

While we are honestly troubled by the district court's erroneous admission of irrelevant statistical evidence, we conclude that in light of both the curative effect of the given jury instructions and the one-sidedness of the evidence presented on those claims whose verdicts we uphold, Defendants did not suffer substantial injustice as a result of the court's evidentiary ruling. Accordingly, we decline to reverse on these grounds.

The Defendants also challenge the district court's rulings on the admissibility of non-statistical evidence offered to establish "custom" under section 1983. Specifically, Defendants challenge the district court's admission of testimony from Sam Brownlee, former County Manager of Fulton County from 1972-1990, and Alice Smith, former Clerk to the Board of Commissioners who left her position before Sheriff Barrett was elected. Brownlee testified as to four principal points. First, between 1978 and 1989 the Board of Commissioners engaged in public and private discussions about making a deliberate effort to increase minority hiring. Second, the dialogue regarding affirmative action increased in the 1980's when five of the seven members of the Board of Commissioners were black. Third, during Brownlee's time as County Manager, several commissioners told him they believed there were too few blacks at department head level jobs and that he should recommend only the appointment of minorities to these positions until the situation was improved. Finally, in the mid-to-late 1980's outside groups supposedly pressured the County Commission and others within Fulton County government to fill all appointments of any consequence with blacks. Alice Smith testified that Michael Hightower, a black Commissioner, told her she had to be replaced as Clerk with a black individual.

Defendants correctly argue that the admitted testimony is not sufficiently connected in time or subject-matter to the challenged personnel decisions to be admissible. Brownlee's testimony is completely

---

[23]This was the case with the discriminatory discipline claim of A.M. Alexander and the discriminatory transfer clam of Kathy Jones. *See* discussion *infra* sections IV-A1 and V-C1.

unrelated to Sheriff Barrett's actions. His testimony stemmed back twenty years *before* Sheriff Barrett was even elected. Second, the composition of the Board changed between Brownlee's tenure with the Board and Sheriff Barrett's election. Third, there is *no* evidence that the County did anything to suggest that Sheriff Barrett engage in discrimination, let alone that it influenced or coerced her to do so. Smith's testimony is similarly irrelevant to the question of whether Sheriff Barrett discriminated against Plaintiffs. Smith's testimony did not pertain to actions by any Sheriff's Department employee. Moreover, the testimony related to a time period nine years prior to Sheriff Barrett's election.

Although the non-statistical evidence at issue was improperly admitted by the district court, we again conclude its admission did not result in a substantial injustice to Defendants. First, because the anecdotal evidence admitted was so completely unconnected to the question of Sheriff Barrett's discriminatory employment policies, and so unrelated in time to the conduct here at issue, it is highly unlikely the jury would have given this evidence any weight. Second, the district court's jury instructions suggested that this evidence was of no real moment by emphasizing that in order to find Defendants liable they had to find that Sheriff Barrett, not some past and unrelated Board member, engaged in discriminatory employment practices. The court instructed the jury: "The Plaintiffs must show that Sheriff Barrett either encouraged the specific incidents complained of by the Plaintiffs or in some way directly participated in them. At a minimum, the Plaintiffs must prove that Sheriff Barrett at least officially authorized, approved or knowingly acquiesced in the alleged discriminatory conduct." And third, as we have already said, the evidence offered in support of the verdicts we uphold was so one-sided that there is no danger the jury was unduly swayed in reaching these verdicts by the erroneously admitted evidence. In short, we decline the Defendants' invitation to reverse the district court's ruling on this point.[24] Indeed, with regard to all of the erroneously admitted evidence, the

[24]Defendants also challenge the admission of Fulton County's 1978, 1989, and 1990 affirmative action plans. They claim there was no evidence that Sheriff Barrett saw any of the plans at the times she made the determinations at issue in this case, and, thus, these plans could have no relevance to this action. With respect to the 1978 and 1989 plans, there is clearly no temporal relevance, and the district court abused its discretion in admitting them. Indeed, both plans were no longer in effect when Sheriff Barrett took office. As for the 1990 plan, Plaintiffs failed to demonstrate that Sheriff Barrett took the plan into account when she engaged

jury's carefully considered mixed verdicts reflect that it was not unduly swayed by the irrelevant evidence. *See LaSpesa,* 956 F.2d at 1032; *United States v. Nixon,* 918 F.2d 895, 906 (11th Cir.1990).

E.

Defendants also challenge on appeal three of the district court's jury instructions: first, an instruction concerning the relationship between Plaintiffs' claims and the scope of their EEOC charge; second, a charge as to what constitutes a "similarly situated" person for a discriminatory discipline allegation; and finally, the charge regarding when a local government can be held responsible for the acts or statements of its employees.[25] We can find no reversible error in the challenged jury instructions.

Our review of a trial court's jury instructions is limited. *See Eskra v. Provident Life & Accident Ins. Co.,* 125 F.3d 1406, 1415 (11th Cir.1997). If the instructions accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed. *See id.* On appeal, we examine "whether the jury charges, considered as a whole, sufficiently instructed the jury so that the jurors understood the issues and were not misled." *Carter,* 122 F.3d at 1005 (citation omitted). When measured against this standard, if the jury charge as a whole correctly instructs the jury, even if it is technically imperfect, no reversible error has been committed. *Bateman v. Mnemonics, Inc.,* 79 F.3d 1532, 1543 (11th Cir.1996). In short, we will reverse because of an erroneous instruction only if we are " 'left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations.' " *Carter,* 122 F.3d at 1005 (quoting *Johnson v. Bryant,* 671 F.2d 1276, 1280 (11th Cir.1982)).

---

in any of the challenged actions. However, for the reasons we have previously stated, we can discern no prejudicial effect stemming from the admission of these plans.

[25]Defendants also contest the district court's charge that, under Georgia law, Sheriff Barrett had the final decision-making authority in employment matters in the Sheriff's Department, and the instruction on statistical evidence. These challenges are addressed in separate discussions devoted to section 1983 liability and admission of statistical evidence. See discussion supra sections III-B and III-D.

First, the Defendants challenge the district court's charge concerning the relationship between the Plaintiffs' Title VII claims and the scope of their EEOC charges. The district court instructed the jury in these terms:

> Plaintiff is required to file charges of discrimination with the Equal Employment Opportunity Commission or the EEOC and to receive from the EEOC a notice of the right to sue. An EEOC charge is sufficient when it identifies the parties and describes generally the complained of act or practice. While you may review the EEOC charges as evidence of Plaintiffs' contentions at the time they were filed, the claims asserted in this case may encompass discrimination claims that are like the discrimination described in the EEOC charges, as well as claims that may reasonably be expected to grow out of the allegations in the EEOC charge during a reasonable investigation by the EEOC.

We can find no error in this charge, and conclude that it adequately stated the correct law.

The starting point of ascertaining the permissible scope of a judicial complaint alleging employment discrimination is the administrative charge and investigation. *See Griffin v. Carlin,* 755 F.2d 1516, 1522 (11th Cir.1985). No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge. *See generally* 42 U.S.C. § 2000e-5. EEOC regulations provide that charges should contain, among other things, "[a] clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices." 29 C.F.R. § 1601.12(a)(3). A "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Mulhall v. Advance Security, Inc.,* 19 F.3d 586, 589 n. 8 (11th Cir.1994) (citing *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455 (5th Cir.1970)). Defendants contend that many of Plaintiffs' Title VII claims were not related to the allegations of discrimination raised in their EEOC charges. We are not persuaded.

We observe at the outset that in class actions brought under Title VII, which this case was before it was decertified after the jury had returned its verdict, it is not necessary for all class members to have filed EEOC charges or to have received notices of the right to sue in order to be represented by the class. *See Griffin v. Dugger,* 823 F.2d 1476, 1492 (11th Cir.1987) (citing *Oatis v. Crown Zellerbach Corp.,* 398 F.2d 496, 498-99 (5th Cir.1968)). As long as one named plaintiff timely files an EEOC charge, "the precondition

29

to a Title VII action is met for all other named Plaintiffs and class members," *id.* (citing *Oatis,* 398 F.2d at 498-99), and under the so-called "single-filing rule," if one plaintiff, in a multi-plaintiff, non-class action suit, " 'has filed a timely EEOC complaint as to that plaintiff's individual claim, then co-plaintiffs with individual claims arising out of similar discriminatory treatment in the same time frame need not have satisfied the filing requirement.' " *Forehand,* 89 F.3d at 1566 n. 8 (quoting *Jackson v. Seaboard Coast Line R.R.,* 678 F.2d 992, 1011 (11th Cir.1982)).

In this case, every plaintiff alleged in his or her EEOC charge that he or she was the victim of a pattern or practice of discrimination against white employees in the Sheriff's Department. The allegations ultimately leveled in the complaint filed in the district court are either addressed in the *collective* EEOC charges or could be reasonably expected to grow out of those administrative charges of discrimination. Major Alexander's EEOC charge of discrimination, for example, contains the central claim that there was a general pattern or practice of race discrimination against white employees of the Sheriff's Department in hiring, promotions, job assignments, and discipline. The other EEOC charges are not as specific as Major Alexander's; they are limited to allegations of discrimination in promotions to classified and unclassified positions. It is true that several claims of racial discrimination asserted in Plaintiffs' complaint—denial of access to promotional exams, reclassifications, and transfers—were not specifically mentioned in the EEOC charges. However, these claims are sufficiently similar to the promotions and job assignment claims—all involve the allegedly race-based rejection of Plaintiffs for desired positions within the Sheriff's Department—to be fairly characterized as arising out of similar discriminatory treatment to that specifically alleged before the EEOC. *Cf. Griffin v. Dugger,* 823 F.2d 1476, 1493 (11th Cir.1987) (holding as dissimilar for the purposes of the single-filing rule non-filing plaintiff's objective testing claim and plaintiff's subjective promotion and discipline claims); *Hill v. AT & T Technologies, Inc.,* 731 F.2d 175, 181 (4th Cir.1984) (holding as dissimilar EEOC charges alleging discrimination in the conditions of employment and plaintiff's

allegations of discrimination in hiring). Accordingly, we reject the Defendants' suggestion that Plaintiffs' Title VII claims did not fall within the ambit of their EEOC charges.

Second, Defendants contend that the district court erred in charging the jury that it could find discrimination where "another similarly situated employee, who is not a member of the protected group, was not treated in a similar manner." Defendants claim that the term "similarly situated" is ambiguous, and that this charge miscasts the governing law of this circuit, which they claim requires the "same or nearly identical conduct." Again, we disagree. Although susceptible to manipulation, the phrase "similarly situated" is the correct term of art in employment discrimination law. *See Olmstead v. L.C. by Zimring,* 527 U.S. 581, 119 S.Ct. 2176, 2193, 144 L.Ed.2d 540 (1999) (Kennedy, J., concurring in the judgment) (characterizing the "normal definition of discrimination" as "differential treatment of *similarly situated* groups" (emphasis added)); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981) ("*McDonnell Douglas* teaches that it is the plaintiff's task to demonstrate that *similarly situated* employees were not treated equally." (emphasis added)); *Osram Sylvania, Inc. v. Teamsters Local Union 528,* 87 F.3d 1261, 1265 (11th Cir.1996) ("Disparate treatment exists when *similarly situated* workers are treated differently even though they have committed similar acts." (emphasis added)); *Jones v. Gerwens,* 874 F.2d 1534, 1540 (11th Cir.1989) (holding that in order to show discriminatory discipline, plaintiff must show either that he did not violate the work rule or "that he engaged in misconduct *similar* to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against other persons who engaged in *similar* misconduct" (emphasis added)). Moreover, the law does not require that a "similarly situated" individual be one who has "engaged in the same or nearly identical conduct" as the disciplined plaintiff. Instead, the law only requires "similar" misconduct from the similarly situated comparator. *See, e.g., Osram,* 87 F.3d at 1265; *Gerwens,* 874 F.2d at 1540-41 & n. 12.

Third, the Defendants argue that the district court erred when it charged the jury that "a local government is responsible under [Title VII] for any of the acts and statements of its employees which are

31

made within the scope of their duties as employees of the government." The Defendants suggest that the jury could have concluded that Fulton County was liable for any "stray remarks" made that were unrelated to the employment decisions. This argument is unpersuasive for three reasons: first, the Defendants failed to identify any "stray remarks" introduced into the record that may have been misinterpreted by the jury; second, in the beginning of the district judge's instruction on Title VII, he specifically discussed the statute's coverage, which limits Fulton County's liability to *intentional* acts of discrimination by its employees affecting the Plaintiffs' terms and conditions of employment; and third, the gist of the district court's instruction, even when selectively quoted by Defendants, is correct. *See, e.g.,* Restatement (Second) of Agency § 219(1) (1958); *see also Faragher v. City of Boca Raton,* 524 U.S. 775, 793, 118 S.Ct. 2275, 2286, 141 L.Ed.2d 662 (1998) (noting that, under agency principles, " 'a master is subject to liability for the torts of his servants committed while acting in the scope of their employment' ") (quoting Restatement (Second) of Agency § 219(1) (1958)); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 754, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (explaining that "Congress has directed federal courts to interpret Title VII based on agency principles"); *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1558 n. 4 (11th Cir.1987) (explaining that "[b]ecause the acts of an employer's 'agents' are those of the employer, an employer is directly, rather than indirectly, liable for its 'agents' Title VII violations"); *Williams v. City of Montgomery,* 742 F.2d 586, 589 (11th Cir.1984) (observing that "[w]here the employer has delegated control of some of the employer's traditional rights, such as hiring or firing, to a third party, the third party has been found to be an 'employer' by virtue of the agency relationship" (citation and quotation marks omitted)).

## IV.

Finally, the Defendants broadly challenge the sufficiency of the evidence presented to support the verdicts and damages entered against them. We review *de novo* the district court's denial of Defendants' motion for judgment as a matter of law, applying the same standards used by the district court. *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1526 (11th Cir.1997). In conducting our review, we consider all of

the evidence and draw all reasonable inferences in a light most favorable to the non-moving party. *See Beckwith v. City of Daytona Beach Shores,* 58 F.3d 1554, 1560 (11th Cir.1995). Ultimately, we must decide "whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." *Rabun v. Kimberly-Clark Corp.,* 678 F.2d 1053, 1057 (11th Cir.1982). Put differently, judgment as a matter of law is proper only when the "facts and inferences point so overwhelmingly in favor of the movant ... that reasonable people could not arrive at a contrary verdict." *Richardson v. Leeds Police Dep't,* 71 F.3d 801, 805 (11th Cir.1995) (citations and internal quotation marks omitted).

At various times in their briefs, the Defendants suggest that some of the Plaintiffs failed to establish a "prima facie" case of discrimination. We need not revisit this question however. "When the trier of fact has before it all the evidence needed to decide the ultimate issue of whether the defendant intentionally discriminated against the plaintiff, the question of whether the plaintiff properly made out a prima facie case 'is no longer relevant.' " *Richardson,* 71 F.3d at 806 (quoting *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983)). Here the Defendants failed to persuade the district court to dismiss Plaintiffs' claims for lack of a prima facie case. The Defendants responded to Plaintiffs' proof by proffering non-discriminatory reasons for some of Sheriff Barrett's actions. At that point, "the factfinder was then required to 'decide whether the rejection was discriminatory within the meaning of Title VII,' " *Combs,* 106 F.3d at 1539 n. 11(quoting *Aikens,* 460 U.S. at 715, 103 S.Ct. at 1481), and the question of whether a Plaintiff had made out a prima facie case was no longer before the district court. Thus, on appeal, we have no occasion to revisit whether Plaintiffs established their prima facie cases. We do consider, however, all of the *evidence* submitted by the Plaintiffs as we determine whether a reasonable jury could disbelieve Defendants' proffered non-discriminatory reasons for the challenged employment decisions. *See id.*

33

Ultimately, we must examine whether the evidence presented on behalf of *each* plaintiff was sufficient to sustain each of the jury's verdicts. We note, however, that eighteen Plaintiffs brought this case alleging a broad based pattern and practice of discrimination, and the great bulk of the evidence presented was admissible as to each of the other Plaintiffs' individual cases precisely because it points to such a pattern and practice. Consequently, although we analyze each aspect of the verdict separately and individually, we emphasize that the sum of the evidence presented additionally supports each of the individual verdicts of discrimination. Thus, although a determination that a defendant may have engaged in a pattern and practice of discrimination is, standing alone, insufficient to support a claim of race discrimination in an individual case, if, as the jury plainly concluded, Sheriff Barrett racially discriminated against each of the eighteen Plaintiffs in various ways, this conclusion undoubtedly makes it more likely, in any given case, that Sheriff Barrett discriminated against a particular plaintiff.

After painstaking review of all the evidence presented we conclude: first, that there was sufficient evidence to sustain the *discriminatory discipline* claims of A.M. Alexander and James NeSmith; second, that there was sufficient evidence to sustain the verdicts in favor of Robert Fox, Gary Gettis, Carolyn Masson, and James NeSmith on their *discriminatory failure to promote* claims, but there was not enough evidence to sustain the verdict in favor of Denise Brooks as to this charge; third, that there was sufficient evidence to support the jury verdict on the *discriminatory transfer or assignment* claim of Kathy Jones, but insufficient evidence to sustain the verdicts on the claims of Guerry Moore, Heidi Schaefer, Benjamin Steele, Denise Brooks, Robert Fox, and Carolyn Masson; fourth, that there was sufficient evidence presented to sustain the verdicts reached on the *discriminatory reclassification* claims of Jimmy Bolt and Robert Smith; fifth, that the evidence was insufficient on the *discrimination in access to promotional examinations* claims of Joseph Bantin, Robert Smith, and Heidi Schaefer; and finally, that the evidence was insufficient to sustain the verdicts on the *discriminatory failure to restore rank* claims of Charles Alexander and Robert Upshaw.

34

For ease of analysis, we group the claims according to the type of employment discrimination alleged—discipline claims, failure to promote claims, assignment or transfer claims, reclassification claims, access to promotional examinations claims, and restoration of rank claims.

*A.    Discipline Claims*

Major A.M. Alexander and Sergeant James NeSmith alleged that they were disciplined more severely than were black officers who committed similar offenses because of their race.  To establish discrimination in discipline, just like showing discrimination in hiring, a plaintiff must first make out a prima facie case demonstrating:  1) that he belongs to a protected class under Title VII;  2) that he was qualified for the job;  and 3) that a similarly situated employee engaged in the same or similar misconduct but did not receive similar discipline.  *See Lathem v. Dep't of Children and Youth Servs.,* 172 F.3d 786, 792 (11th Cir.1999);  *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997).  Once a plaintiff makes a prima facie showing, the burden of going forward shifts to the employer who must provide a specific legitimate non-discriminatory reason for disciplining the employees differently.  *See Burdine,* 450 U.S. at 254-55, 101 S.Ct. 1089;  *Lathem,* 172 F.3d at 793.  Finally, the ultimate burden of persuasion rests with the plaintiff who must show that the proffered legitimate reasons for the different disciplinary actions were pretextual thereby permitting, but not compelling, the trier of fact to conclude that the employment action at issue was the product of illegal discrimination.  *See Burdine,* 450 U.S. at 256, 101 S.Ct. 1089;  *Lathem,* 172 F.3d at 793;  *Combs* 106 F.3d at 1529-38.

*1.    Major A.M. Alexander*

Major Alexander claims that he was disciplined more severely than were similarly situated black officers who committed similar offenses on account of his race.  Major Alexander was both suspended for fifteen days *and* transferred from his position in the Service Division after allowing a subordinate to drive several Department cars home in violation of Sheriff Barrett's instructions.  While Sheriff Barrett contended that the suspension and transfer of Alexander to Grady Hospital were appropriate disciplinary responses to

35

Major Alexander's transgression, Major Alexander presented evidence suggesting he was demonstrably treated more harshly than a black officer who committed exactly the same offense. Alexander claimed that Major Louwinski, a black officer, also allowed a subordinate law enforcement officer, Teresa Simon, to drive a car home in violation of departmental policy but, unlike Alexander, he was not disciplined. While both Louwinski and Sheriff Barrett testified that Louwinski had received permission from the Sheriff before authorizing Simon to drive the car home, Alexander argued that this assertion was not worthy of belief. Neither Louwinski nor Sheriff Barrett could produce a copy of the memorandum Louwinski claimed that he wrote to Sheriff Barrett seeking permission to allow Simon to take home a Department vehicle. And, when pressed on cross-examination, Louwinski conceded that he could not even remember what the memorandum supposedly said. In addition, another officer, Barron Cole, testified that soon after Major Alexander left the Service Division and Louwinski took over, Louwinski allowed three more law enforcement officers to drive Department cars home, without the imposition of any sanctions. Neither Major Louwinski nor Sheriff Barrett submitted any evidence suggesting that Sheriff Barrett authorized Louwinski to allow any of those officers to take home Department cars, and none of their names appeared on a list of officers permitted to take home Department vehicles submitted into evidence by the Defendants. Based on all the evidence presented, we are satisfied the jury had sufficient basis to find that Alexander was treated more harshly than Louwinski because of his race. Accordingly, we uphold the jury's compensatory damages award against Sheriff Barrett.

We must consider separately the appropriateness of the jury's award of punitive damages. Last term in *Kolstad v. American Dental Ass'n.,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), the Supreme Court determined the circumstances under which a court can award punitive damages under Title VII.[26] The Supreme Court rejected the holding of the Court of Appeals for the District of Columbia that eligibility for punitive damages required a showing of "egregious" misconduct by the employer. *Kolstad,* 119 S.Ct. at 2124. The Court emphasized that what was necessary for an award of punitive damages was not "a showing of

[26]Title VII's punitive damages provision was based on §§ 1983 and 1981 standards. *See, e.g., Kolstad,* 119 S.Ct. at 2124; *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.,* 188 F.3d 278 (5th Cir.1999)

36

egregious or outrageous discrimination" but only a showing that the employer acted with the appropriate state

of mind. *Id.* at 2124. The appropriate state of mind meant acting "with malice or with reckless indifference

to [the plaintiff's] federally protected rights," § 1981a(b)(1), which, the Court explained, required a showing

of either an *evil intention* to deprive a plaintiff of his federally protected rights or a *conscious indifference*

to these rights. *Id.* at 2124-25.[27] At a minimum, the Court explained, in order to be liable in punitive

damages, "an employer must ... discriminate in the face of a perceived risk that its actions will violate federal

law." *Id.* at 2125.

The Supreme Court emphasized that this standard of liability is higher than that for establishing a

right to compensatory damages. *Id.* at 2124. Liability for punitive damages requires not merely a showing

of intentional discrimination but a showing that the employer acted with "knowledge that it may be acting

in violation of federal law." *Id.* at 2124. The Court explained that under this standard:

> [t]here will be circumstances where intentional discrimination does not give rise to punitive damages.... In some instances, the employer may simply be unaware of the relevant federal prohibition. There will be cases, moreover, in which the employer discriminates with the distinct belief that its discrimination is lawful. The underlying theory of discrimination may be novel or otherwise poorly recognized, or an employer may reasonably believe that its discrimination satisfies a bona fide occupational qualification defense or other statutory exception to liability.

*Id* at 2125. The instant case, however, does not fall into this category of cases in which intentional

discrimination was shown but the appropriate state of mind for punitive damages was not. The theory of

discrimination at issue in this case, the illegality of race-based employment decisions, is neither novel nor

poorly recognized. The question of race as a bona fide occupational qualification was never suggested. Most

importantly, however, Sheriff Barrett did not operate under any misapprehension about the legality of treating

black and white law enforcement officers differently. Indeed, Sheriff Barrett unambiguously testified that

---

[27]The Supreme Court in *Kolstad* relied primarily on its earlier case of *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), which described the standard for awarding punitive damages in § 1983 cases, to illuminate the meaning of the terms "malice" and "reckless indifference" as used in the parallel standard for awarding punitive damages under Title VII. *Smith,* like *Kolstad,* emphasized that malice or an intent to injure was not required for an award of punitive damages, but only reckless indifference which, the Court suggested, entailed a "criminal indifference to civil obligations" or a "subjective consciousness of risk of injury." *Id.* at 37 n. 6, 41, 51, 103 S.Ct. 1625.

she knew it was illegal to treat employees differently on account of race.[28]  Given the jury's amply supported finding that Sheriff Barrett intentionally discriminated against Alexander on account of his race, in concert with Sheriff Barrett's self-professed understanding that such treatment deprives an employee of his federal rights, a reasonable jury could conclude that Sheriff Barrett indeed acted "in the face of a perceived risk that [her] actions [would] violate federal law." *Id.* at 2125. *See also Equal Employment Opportunity Commission v. Wal-Mart Stores, Inc.,* 187 F.3d 1241, 1246 (10th Cir.1999) (holding that because store manager testified he was familiar with the requirements of the ADA a reasonable jury could have concluded that the employer intentionally discriminated against plaintiff in the face of a perceived risk that its action would violate federal law and upholding award of punitive damages).

Accordingly, we uphold the jury's punitive damages award against Sheriff Barrett.

*2.    James NeSmith*

---

[28]The relevant portion of the transcript is as follows:

Q:    Well, it wouldn't be—would you agree that it would be permissible to terminate people because of their race?

A:    Would I agree—I'm sorry.

Q:    Does any reason include race?

A:    It wouldn't for me.

          ...

Q:    So when you say that they are terminable at will or could be fired for any reason, you are not asserting that it would be okay to fire someone because of their race?

A:    I would never assert that, no.

          ...

Q:    ... Although no one has a right to a classified job, people do have a right to be considered for those jobs independent of their race.  Would you agree?

A:    Certainly.

R3-16-216-217.

38

Sergeant James NeSmith alleged that on two occasions he too was disciplined more severely than were similarly situated black employees. First, Sergeant NeSmith points to his receipt of a letter of reprimand from Chief Deputy Gregory P. Henderson for his role in releasing two female inmates from the Jail who were wanted by the Waycross, Georgia police. Sergeant NeSmith was working as the Relief Sergeant at the Booking Intake Area at the Jail when the two women, who were supposedly wanted by the Waycross Police Department, were brought in. After noticing discrepancies between the physical characteristics of the two women and the descriptions of the individuals wanted by the Waycross Police and after discussing the situation with a detective in the Waycross Police Department and with Sergeant David Mosley, a black man who was in charge of the Booking Intake Area at the Jail, Sergeant NeSmith released the two women. Soon thereafter, Sergeant NeSmith learned that the women he had released were in fact the women who were wanted by the law enforcement authorities in Waycross. Indeed, Sergeant Mosley testified that he bore the greater responsibility for the decision to release the two women. Sergeant Mosley, however, received no reprimand for his role in the release.

Second, Sergeant NeSmith points to the discipline he received—being assigned to the "guard shack"—after a black prisoner was assaulted in his cell while NeSmith was on duty in the control tower. Sergeant NeSmith was working in a control tower in the Booking Intake Area when he observed Sergeant LeBarron Woodard and Officer Marvin Swint, both black officers, physically remove a combative prisoner from a police car. The officers put the prisoner in a padded cell which Sergeant NeSmith could not see from the control tower. Shortly thereafter, the prisoner was abused in his cell. While the charges of abuse were being investigated, NeSmith was assigned to the "guard shack," a small building that controls the outer gate of the Jail, and a position not generally filled by a sergeant. The two black officers, Sergeant Woodard and Officer Swint, were not reassigned during the investigation.

Defendants did not present any non-discriminatory reason for why NeSmith received different treatment in both the booking and police brutality incidents than did the other officers who were more closely

involved, except to say simply that NeSmith's conduct merited the actions taken by the Department. Based on the evidence presented showing that NeSmith received punishment when black officers involved in the same incidents did not, we are satisfied that the jury had a reasonable basis to find that Sergeant NeSmith was twice disciplined on account of his race.

B.      Failure to Promote Claims

In order to prevail on a discriminatory failure to promote claim, each plaintiff must establish a prima facie case of race discrimination by showing that: 1) he is a member of a protected minority; 2) he was qualified and applied for the promotion; 3) he was rejected despite his qualifications; and 4) other equally or less qualified employees who are not members of the protected minority were promoted. *See Taylor v. Runyon,* 175 F.3d 861, 866 (11th Cir.1999) (citing *Wu v. Thomas,* 847 F.2d 1480, 1483 (11th Cir.1988)). Again, once the plaintiff has made out a prima facie case of discrimination, the employer must articulate some legitimate, non-discriminatory reason for the employee's rejection. *See Wu,* 847 F.2d at 1483-84. If the employer meets this burden of production, the plaintiff then must establish that the defendant's proffered reasons for promoting a black officer instead of plaintiff were pretextual. *See id.*

In a failure to promote case, however, a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the officer who received the position he coveted. A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race. We have explained, "a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where ... the reason is one that might motivate a reasonable employer." *Combs,* 106 F.3d at 1543. *See also Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1361 (11th Cir.1999) (emphasizing that courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision"); *Deines v. Texas Dept. of Protective and Regulatory Servs.,* 164 F.3d 277 (5th Cir.1999) (explaining that "it is not the function of the

40

jury to scrutinize the employer's judgment as to who is best qualified to fill the position.... The single issue for the trier of fact is whether the employer's selection of a particular applicant over the plaintiff was motivated by discrimination."). However, both the Supreme Court and this court have observed that evidence showing an employer hired a less qualified applicant over the plaintiff may be probative of whether the employer's proffered reason for not promoting plaintiff was pretextual. *See Walker v. Mortham,* 158 F.3d 1177, 1190 (11th Cir.1998) (" 'The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination.' ") (quoting *Burdine,* 450 U.S. at 258-59, 101 S.Ct. 1089). *See also Taylor,* 175 F.3d at 868 (stating that evidence of plaintiff's superior experience "would permit a jury to disbelieve" that the employer actually relied on the chosen candidate's experience when it promoted him).

Other circuits have more clearly articulated the evidentiary burden a plaintiff must meet in order to prove pretext by showing he was more qualified than the person promoted. In *Deines,* for example, the Fifth Circuit affirmed the district court's instruction to the jury stating that: "disparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless those disparities are so apparent as virtually to jump off the page and slap you in the face." 164 F.3d at 280. The court explained that the phrase "jump off the page and slap you in the face" "should be understood to mean that disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question. This evidentiary standard does not alter the plaintiff's evidentiary burden to prove the fact of intentional discrimination by a preponderance of the evidence. Instead, the standard only describes the character of this particular type of evidence that will be probative of that ultimate fact...." *Id.* at 280-81. The Tenth Circuit in *Simms v. Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Services,* 165 F.3d 1321 (10th Cir.1999), suggested a similar evidentiary burden for proving pretext. According to the Tenth Circuit, "Our role is to

41

prevent unlawful hiring practices, not to act as a 'super personnel department' that second-guesses employers' business judgments.... Moreover ... [plaintiff] provides no evidence that he was so clearly better qualified than Mr. Valley that a jury could reasonably conclude that [the employer] based its decision on something other than its proferred reason." *Simms,* 165 F.3d at 1329-30.

Here, the jury found that five Plaintiffs, Denise Brooks, Robert Fox, Gary Gettis, Carolyn Masson, and James NeSmith, would have been promoted but for their race.[29] In support of their claims, Plaintiffs introduced several pieces of generally applicable evidence. Among other things, the Plaintiffs pointed out that between February 1993 and October 1994, nine out of ten promotions to unclassified positions went to blacks,[30] and notably that several blacks who were promoted, Greg Walker (Sergeant to Captain), Gary Harmon (Sergeant to Captain), and Dave Louwinski (Sergeant to Major), skipped ranks, notwithstanding the fact that the Fulton County "classified" captain job description expressly provides that Captains should have "two years experience as a Lieutenant or comparable rank." Plaintiffs established that there were no minimum qualifications or quantifiable special skills applicable to the "unclassified" positions, that there was no formal application or selection process for those positions, and that there were no advertising and recruitment efforts.[31] Finally, each of these Plaintiffs directed the jury generally to the evidence that Sheriff

[29]Sheriff Barrett promoted five individuals to unclassified captain positions over Plaintiffs: Greg Walker, Gary Harmon, Dorothy Walker, Edward McIver, and Mark Calloway. All of these individuals except for Mark Calloway are black.

[30]The ten promotions to unclassified positions made by Sheriff Barrett went to Lafayett Briggs, David Louwinski, Michael Cooke, Gary Harmon, Edward McIver, Riley Taylor, Dorothy Walker, Edgar Hillsman, and Greg Walker, twice. Greg Walker was promoted first to unclassified captain on February 25, 1993, and then to unclassified major on May 11, 1994. Of these individuals only Riley Taylor is white.

[31]Sheriff Barrett testified at trial that there were no formal hiring requirements by which she was bound in promoting individuals to unclassified positions. According to Sheriff Barrett:

> I know that I'm not held on the unclassified service to what is listed [as the minimum qualifications for jobs in the County job descriptions].... I'm also saying I'm not held to these documents on the unclassified service.... I'm free to make those appointments based on my best judgment of a person's ability to perform whatever function it is that I'm asking them to perform.

Barrett engaged in a pervasive pattern or practice of discrimination against white law enforcement officers on account of race.

Assessing whether the Plaintiffs have presented sufficient evidence to sustain a verdict that they were denied a promotion because of race is particularly difficult in a case such as this where the disputed positions are essentially political appointments. While the usual disparate treatment case involves a position for which the qualifications may be measured objectively, we anticipate that for political appointments the qualifications required will be both subjective and objective. We expect, for example, that an elected official may appoint a command team, or a political staff, that not only is objectively qualified to handle its day-to-day job duties, but that also shares a vision with and possesses a certain degree of loyalty to the elected official who appoints them. *See, e.g., Elrod v. Burns,* 427 U.S. 347, 367, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (recognizing that loyalty is a legitimate hiring criteria for an elected official to use when selecting individuals to serve in policymaking positions under him); *Shahar v. Bowers,* 114 F.3d 1097, 1104 (11th Cir.1997) (noting that the state Attorney General, who is an elected official, "may properly limit the lawyers on his professional staff to persons in whom he has trust"). We add that it is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated. We measure each claim against these standards.

1. *Denise Brooks*

Sergeant Brooks claimed that Sheriff Barrett failed to promote her to the unclassified position of captain because of race. Brooks suggested that she was more qualified than a black man, Greg Harmon,

---

...

> I don't know there are any thresholds for eligibility as required by law. I think that maybe common sense might dictate that I do something like make certain that a person I want to appoint as captain is, in fact, a peace officer. But I don't even know that I have thresholds [for eligibility] legally.

R24-37-4253-4254.

whom Sheriff Barrett did appoint to an unclassified captain position because, although both were sergeants, she had experience working in an administrative capacity in the Jail and Harmon did not.

At trial, Sheriff Barrett plainly articulated a legitimate, non-discriminatory reason for appointing Harmon to the unclassified position, namely that Harmon had been elected by his peers to lead the local union and could keep an open line of communication between the rank-and-file officers and the Sheriff. But in response, Brooks pointed to no evidence suggesting this legitimate race-neutral reason was not the real reason Sheriff Barrett promoted Harmon and not Brooks. *See Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1184 (11th Cir.1984) (explaining that an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason"). Based on the whole record, we are constrained to conclude that the evidence simply cannot support the jury's finding that Sheriff Barrett discriminated against Brooks when the Sheriff appointed Harmon to the unclassified captain position.

2.      *Robert Fox*

Lieutenant Fox also alleged that Sheriff Barrett discriminated against him on the basis of race when she failed to promote him to the position of unclassified captain but instead promoted two black men to the unclassified position. Fox testified that he had more experience than either Greg Harmon or Edward McIver and had served as their supervisor before Sheriff Barrett appointed them to their unclassified captain positions. Sheriff Barrett's legitimate non-discriminatory reason for promoting Harmon remains just as valid with respect to Fox as it was for Brooks. Sheriff Barrett, however, failed to identify *any* specific qualifications of McIver's that explained his appointment. Indeed, the Sheriff offered *no* reason, let alone a legitimate race-neutral reason, to explain the promotion of McIver and not Fox. As a result, we conclude that a reasonable jury could find, as it plainly did, that the Sheriff promoted McIver and not Fox to the position of unclassified captain on account of race. Accordingly, we affirm the jury's verdict in favor of Fox on his failure to promote claim.

*3.      Gary Gettis*

Captain Gettis argued that he too was more qualified than both Harmon and Dorothy Walker who were selected to serve in unclassified positions. Gettis testified about his educational background and indicated that the fact that he passed the promotional examination for the rank of captain made him qualified for the equivalent unclassified position. Gettis also testified that he was more qualified than Dorothy Walker for this position because Walker regularly sought his assistance and advice with her duties and had difficulty understanding orders. Again, Sheriff Barrett's legitimate non-discriminatory reason for promoting Harmon is valid and was in no way challenged as being pretextual. But, like with McIver, Barrett failed to identify what specific qualifications merited Dorothy Walker's promotion. Because Sheriff Barrett failed to offer any legitimate non-discriminatory reason to explain why Dorothy Walker was promoted over Gettis, a reasonable jury could attribute the Sheriff's failure to promote Gettis to race.

Gettis also testified, however, that he would not have accepted an unclassified position without written assurances of job security. All of the individuals Sheriff Barrett appointed to unclassified positions accepted the appointments *without* conditions and, on this record, the evidence is unrefuted that Sheriff Barrett would not have provided Gettis with the written assurance of job security he desired. As a result, we are constrained to conclude that Gettis could not have suffered any pecuniary damages as a result of not being selected as an unclassified captain because he would not have accepted the position had it been offered. Gettis is therefore not entitled to the "make whole" relief of the benefits and the pay of a job he concededly would not have accepted. Accordingly, we reverse the district court's entry of a *back pay* award as well as its order granting individual injunctive relief to Captain Gettis requiring Defendants to recalculate his retirement and other employee benefits as if he had been appointed to an unclassified captain position on June 1, 1993. We leave intact, however, the *compensatory damages* award because there is competent testimony that he suffered emotional distress as a result of his non-selection to the unclassified position. Simply put, a reasonable jury could have found that even though Captain Gettis would not have accepted an unclassified

appointment had he been offered one, he nonetheless experienced sufficient pain and suffering as a result of not being selected for the position because of his race to justify the $10,000 compensatory damages award he received. *See Stallworth v. Shuler,* 777 F.2d 1431, 1435 (11th Cir.1985) (affirming compensatory damages award of $100,000 because of emotional distress and humiliation plaintiff suffered as a result of being denied promotions on account of race).

4.      *Carolyn Masson*

Lieutenant Carolyn Masson alleged that she too was discriminated against on the basis of race by being overlooked for unclassified captain positions that were awarded by Sheriff Barrett to Harmon, McIver, Greg Walker, and Dorothy Walker. As stated above, Sheriff Barrett offered *no* specific explanation for her selection of either McIver or Dorothy Walker to unclassified positions. As a result, we are satisfied that the jury had sufficient evidence from which to conclude that Lieutenant Masson was more qualified than were McIver or Dorothy Walker and that they were promoted instead of her on account of race.

Like Gettis, however, Masson testified that she would not have accepted an unclassified appointment in the absence of written assurances that she would retain her unclassified position until she retired and that she would not be fired from that position when another Sheriff took office. Because Masson plainly would not have accepted the unclassified captain position had it been offered to her, again we conclude that Masson is not entitled to the *equitable* relief ordered by the district court of backpay, the pay grade, employee benefits, and seniority she would have received had she been appointed to the position of unclassified captain on June 1, 1993. As with Captain Gettis, however, she is entitled to the $10,000 in compensatory damages the jury awarded her for the emotional distress she suffered as a result of her non-selection.

5.      *James NeSmith*

Sergeant NeSmith argued that Sheriff Barrett discriminated against him by denying him a promotion to the position of unclassified captain granted to Harmon, Dorothy Walker, and Greg Walker. As discussed previously, Sheriff Barrett proffered legitimate, non-discriminatory reasons to explain Harmon's promotion

that the jury was given *no* reason to disbelieve. However, NeSmith testified that he was more qualified than Dorothy Walker because she never passed the lieutenant examination, and more qualified than Greg Walker because Walker had only previously served at the Jail commissary, whereas NeSmith had worked in several areas of the Jail, as well as in the Service and Court Services divisions. Based on this evidence, and particularly in light of Sheriff Barrett's complete failure to explain why she appointed either Dorothy or Greg Walker to unclassified captain positions, we conclude that there was sufficient evidence for the jury to find that Sheriff Barrett did not select NeSmith for an unclassified captain position on account of his race.

Nevertheless, the Defendants urge us not to permit NeSmith to recover on this claim because, they contend, he testified that he too would not have accepted an unclassified position without written assurances of job security. In reviewing the record, however, we find that NeSmith's testimony is not at all clear on this point.[32] Because a reasonable jury could understand his testimony as allowing that NeSmith would have accepted an unclassified appointment, we uphold the jury's award of compensatory damages and the district court's individual injunctive relief.

6.      *Punitive Damages*

As for the Plaintiffs whose liability judgments we have upheld—namely, Fox, Gettis, Masson, and NeSmith—we are invited to examine whether the evidence was sufficient to support the punitive damages awarded to each of them. As we stated previously, *see* discussion *supra* section IV-A1, the appropriateness of punitive damages rests on the defendant's state of mind. In order to be liable for punitive damages an

---

[32]The relevant testimony is as follows:

Q:      If you had been offered the captain's position awarded to Gary Harmon, would you have accepted it knowing it was an unclassified position?

A:      That's a hard question. At that time?

Q:      Yes, at that time.

A:      I'm not really sure. That is a hard question to answer. Knowing what I know now, no.

R3-16-300.

47

employer must act with "knowledge that it may be acting in violation of federal law." *Kolstad,* 119 S.Ct. at 2124. In the instant case, Fox, Gettis, Masson, and NeSmith presented sufficient evidence to sustain the jury's finding that Sheriff Fox intentionally discriminated against them because of race. This evidence, combined with Sheriff Barrett's professed understanding that such treatment violates federal law, is sufficient to sustain the jury's verdict on punitive damages. A reasonable jury could have found, based on the evidence presented, that Sheriff Barrett acted toward them "in the face of a perceived risk that [her] actions [would] violate federal law." *Id.* at 2125. Accordingly we affirm the district court's judgment as to punitive damages on the non-selection claims.

## C.  *Transfer and Assignments*

In order to establish job discrimination in transfers and assignments, a plaintiff must meet a burden similar to the one required for showing discrimination in promotions. First, a plaintiff must make a prima facie case of discrimination by showing that he was treated differently than were similarly situated black officers with respect to transfers and assignments. *See Baldwin v. Birmingham Bd. of Educ.,* 648 F.2d 950, 955 (5th Cir.1981). The burden of going forward then shifts to the defendant to establish a legitimate non-discriminatory reason for the employment decisions. *See id.* Finally, in order to prevail, the plaintiff must then establish that the defendant's asserted reasons are simply a pretext for racial discrimination. *See id.* at 956. Thirteen Plaintiffs alleged that they were discriminated against on account of race with respect to transfers and assignments.[33] Nine Plaintiffs—A.M. Alexander, Brooks, Fox, Jones, Masson, Moore, NeSmith, Schaefer, and Steel—prevailed on their individual allegations of discriminatory transfers and assignments. The claims of Major Alexander and Nesmith have already been discussed in the context of their discipline claims. After thorough review of this record, we conclude there was sufficient evidence presented to sustain the verdict in favor of Kathy Jones, but we are constrained to conclude that the evidence was

---

[33]Transfers denote movement between divisions within the Department, while assignments refer to a change of job responsibility within a division.

48

insufficient to sustain the verdicts for Heidi Schaefer, Guerry Moore, Benjamin Steele, Denise Brooks, Robert Fox and Carol Masson.

1.    *Kathy Jones*

Sergeant Jones alleged that she was discriminated against in her request for transfers because of her race. Jones testified that she was denied transfers out of the Jail, where she had spent her entire career, when such transfers were given to similarly situated black employees. Jones specifically compared herself to Sergeant Benita Wallace, a black woman, who was transferred from the Jail to the Community Relations Division, Sergeant Marcia Greenlee, a black woman who was transferred from the Jail to the Service Division, and Sergeant Earl Glenn, a black man who was transferred from the Jail to the Court Services Division.[34] Defendants explained that the transfers of the black officers out of the Jail was part of Sheriff Barrett's cross-training program designed to give officers who had served exclusively in the Jail an opportunity to serve in other Divisions. Jones argued that this reason for the transfer of the other officers was wholly pretextual. Jones noted that while Sheriff Barrett said her cross-training program was aimed specifically at officers who had served exclusively in the Jail, Jones, who had served her entire eight-year career at the Jail, was not a beneficiary of the program. Furthermore, Jones pointed out that at least two black sergeants were transferred out of the Jail at a time when Sheriff Barrett testified that she needed additional sergeants in the Jail. The evidence is sufficient to sustain the jury's verdict regarding Sergeant Jones's claim, and consequently, we affirm the district court judgment as it pertains to liability on Sergeant Jones's claims.

---

[34]Defendants contend, and Jones agreed, that none of these transferred co-workers wore her rank. Wallace was transferred from the Jail to the Community Relations Division upon her promotion to the position of sergeant, but she had applied for the opening in Community Relations while she was still working at the Jail as a deputy. Greenlee was a deputy at the time of her transfer to the Service Division, but became a sergeant shortly thereafter. Glenn was transferred from the Jail to the Court Services Division on the day of his promotion to sergeant. Since these co-workers of Jones' were promoted to sergeant and transferred at roughly the same time, we believe there is a sufficient basis for comparison between Jones and Wallace, Greenlee, and Glenn.

49

Moreover, this evidence of intentional discrimination, combined with Sheriff Barrett's stated understanding that race-based discrimination in employment violated federal rights, is sufficient to sustain the jury's award of punitive damages for Jones.  *See* discussion *supra* section IV-A1.

2.    *Guerry Moore*

Corporal Moore also alleged that he was discriminated against by Sheriff Barrett because of his race when he was reassigned within the Court Services Division from the Superior Court to the Juvenile Court to operate the metal detector there.  Moore was assigned to the Juvenile Court after being accused by an unknown person in the Sheriff's Department of having used Department computers to review personnel records in connection with the instant lawsuit.  Moore argued the position at the metal detector was tedious and beneath someone with his qualifications.

Considering all of the evidence and drawing all inferences in a light most favorable to the non-moving party, we are constrained to conclude that the evidence does not sustain Corporal Moore's claim that Sheriff Barrett discriminated against him on the basis of race when he was reassigned to work the metal detector.  First, Corporal Moore himself did not attribute the reassignment to racial discrimination, but rather to retaliation for his alleged improper use of Department computers.  Retaliation claims, however, are not part of this lawsuit.  Second, Corporal Moore did not present any evidence of a similarly situated black comparator and therefore did not show that he was treated differently because of his race.  *See Watkins v. Sverdrup Technology, Inc.,* 153 F.3d 1308, 1315 (11th Cir.1998) (explaining that "[t]he most fatal shortcoming ... was that ... Plaintiffs did not identify ... employees similarly situated to themselves").  Third, Corporal Moore actually turned down the opportunity to be transferred out of the Court Services Division to the Service Division which would have ended his metal detector duty.  Based on this record, we cannot sustain the jury's finding that Corporal Moore was discriminated against on the basis of race.  Accordingly, we reverse the district court's judgment in this respect.

3.    *Heidi Schaefer*

Sergeant Schaefer alleged that her requests for transfers out of the Jail and for reassignment within the Jail were denied on account of her race. Schaefer testified that she had sought numerous transfers out of the Jail. According to the record, however, all of Schaefer's transfer requests were made in 1988, notably *four* years before Sheriff Barrett took office and well outside the statute of limitations for Title VII (180 days) or section 1981 and section 1983 claims (two years). Schaefer also testified that she was repeatedly rebuffed when she sought reassignments within the Jail while Sheriff Barrett was in office. Schaefer testified that she requested to work at Visitation, Intake Booking, and Medical, but that she generally received assignments to work as a floor deputy. Schaefer claimed that black officers were assigned to the areas she considered more desirable. Schaefer did not however identify specifically which black officers were given the assignments Schaefer desired, which positions they were assigned to, which positions they were reassigned from, how long they had held their previous assignments, or what their qualifications were for the new assignments. As such, Schaefer has not satisfied her burden of showing that she was treated differently than similarly situated black officers, much less has she shown that such disparate treatment was because of race. *See Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997) (explaining that "[t]o make a comparison of the Plaintiffs's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects"); *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 17 (1st Cir.1994) (noting that "for us to compare Smith's treatment with that of terminated or transferred male executives in a meaningful way, Smith would have to show that she was similarly situated to those men in terms of performance, qualifications and conduct, 'without such differentiating or mitigating circumstances that would distinguish' their situations") (quoting *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992)). Accordingly, we reverse the district court's judgment in favor of Schaefer on her transfer and assignment claims.

4.    *Benjamin Steele*

51

Sergeant Steele alleged that his transfer and reassignment requests likewise were denied because of his race, however Steele too failed to show he was treated differently than a similarly situated black officer. In June 1994, Sergeant Steele requested in writing to his superior, Captain Nash, that he be permanently transferred from the Jail to the Training Division for firearms instruction. In July 1994, Sergeant Steele requested in writing a reassignment to the day shift. Both requests were denied. Sergeant Steele also argued that his temporary removal from participation in a rotation of firearm training instructors was motivated by race.

The evidence in the record is not sufficient to sustain the verdict as to any of Steele's claims. As for the transfer claim, the evidence reflects that only one officer, a white man, was a permanent fire range instructor at the time in question. Because there was only one such position and it was not held by a black officer, there was no similarly-situated black comparator and no evidence that the denial of Steele's transfer request was because of race. *See Holifield,* 115 F.3d at 1562. Similarly, with respect to the reassignment claim, Steele offered no evidence of a similarly situated black comparator who received a reassignment similar to the one he was denied. As for the claim regarding Sergeant Steele's temporary removal from the firearm training rotation, Defendants argued that Sergeant Steele was removed from the rotation temporarily because the Jail was short of sergeants. Sergeant Steele also conceded that there was a shortage of sergeants at the Jail during his regularly scheduled shift, and he offered no evidence suggesting this proffered reason for his temporary removal from the firearm rotation was pretextual. Based on this record, we conclude that a reasonable jury could not have found the Defendants' legitimate, non-discriminatory reason for Sergeant Steele's temporary removal from the training rotation to be pretextual, and we therefore reverse the jury verdict rendered in Steele's favor.

5.      *Denise Brooks*

Sergeant Brooks alleged discrimination in the denial of her requests for transfer or reassignment to different positions within and outside the Jail. Shortly after Sheriff Barrett took office, Brooks requested a

transfer from the Jail to the Court Services Division. Her request was denied and she was informed that no transfers were being granted during the transition between the McMichael and Barrett administrations. Brooks was also denied reassignment within the Jail to Central Control and Records. Brooks argued she was discriminated against on the basis of race because Antonio Johnson, a black man, was assigned to Central Control instead of her.

As for the transfer claim, Brooks conceded that no one was transferred during the transitional period and that after the period ended both black and white supervisors were transferred. Brooks did not produce any evidence showing that a similarly situated black officer was permitted to transfer at the time when she was not. As for the reassignment claim, Brooks could not recall when she had requested assignments to Central Control and Records or who was the Sheriff at that time. She therefore established no causal nexus between Sheriff Barrett and the challenged employment decisions. *See Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093, 67 L.Ed.2d 207 (noting that the plaintiff bears the burden of showing the *defendant* intentionally discriminated against her). Furthermore, Brooks was not sure that Johnson ultimately received the Central Control assignment and did not know the identity or race of the individual who ultimately received the Records assignment. She did not, therefore, show she was treated differently than a similarly situated black comparator with respect to reassignments. We conclude that the evidence was not sufficient to sustain the jury's finding that the Defendants discriminated against Brooks on the basis of race in denying either her transfer or her reassignment requests.

6.     *Robert Fox*

Lieutenant Fox alleged that Sheriff Barrett transferred him from the Court Services Division to the Jail in 1994 because of his race. Defendants contend that at the time Fox was transferred to the Jail, a number of other lieutenants—white and black alike—were also transferred from the Jail to other divisions, and from other divisions to the Jail in furtherance of Sheriff Barrett's policy of cross-training officers. Fox failed to present any evidence that could cause a reasonable jury to disbelieve Defendants' proffered reason for Fox's

transfer, or to believe his transfer was instead the product of race-based discrimination. *See Holifield,* 115 F.3d at 1565; *Karazanos v. Navistar Int'l Trasp. Corp.,* 948 F.2d 332, 336 (7th Cir.1991). As a result, we reverse the jury's verdict in his favor.

7. *Carolyn Masson*

Lieutenant Masson alleged that she was discriminated against on the basis of race when she was reassigned from the Female Detention Unit to the Superior Court and then reassigned back to the Female Detention Unit five months later after an incident involving a subordinate. Masson argued that while she repeatedly asked to be reassigned from her position at the Female Detention Unit to another division in the Court Services, her reassignment to work the metal detector at the Superior Court was beneath her and was the product of race-based discrimination, as was her reassignment back to the Female Detention Unit five months later.

Masson testified that she did not know of any other lieutenant who was assigned to work the metal detector at the Superior Court. While this may be true, the record reflects that Major Jones assigned Masson to operate the metal detector in the mornings because Masson requested a workday from 7:30 to 3:30 p.m. In order to accommodate this request, Major Jones explained to Masson that she would need to assist with the metal detectors in the mornings and Masson agreed. Masson offered no evidence suggesting the transfer was discriminatory.

Defendants also presented evidence showing that Masson was reassigned to the Female Detention Unit because she had failed to adequately supervise a subordinate at the Superior Court metal detector and had allowed weapons to be brought into the courthouse. Defendants also introduced testimony from Masson's supervisor, Captain Arndt, that Masson often complained about and questioned assignments he gave her and had personality conflicts with several of the deputies.

Based on review of all of the evidence presented, there is no basis for a reasonable jury to conclude that Masson's assignment to the metal detector at the Superior Court or her subsequent reassignment to the

Female Detention Unit was made on account of race. Defendants proffered legitimate, non-discriminatory reasons for each employment decision, which remain undisputed. We therefore reverse the jury verdict rendered for Lieutenant Masson.

D.    *Reclassification Claims*

According to Fulton County employment practices, a Department head may seek an upward reclassification of an employee's classified position when the supervisor believes the employee is performing the duties of a higher level position. From the beginning of her tenure on December 14, 1992, to the advent of this lawsuit in April 1994, Sheriff Barrett reclassified four sworn officers, all of whom were black. The jury determined that Sheriff Barrett did not reclassify Plaintiffs Sergeant Bolt and then-Acting Sergeant Smith in whole or in part because of their race.

Bolt argued that Sheriff Barrett discriminated against him on the basis of race by not reclassifying him as a lieutenant despite the fact that he performed the tasks of a lieutenant for thirteen months after the retirement of Lieutenant Hicks. Smith too alleged that Sheriff Barrett discriminated against him by not reclassifying him to the position of sergeant even though he became an acting sergeant in 1991, carried out the responsibilities of a sergeant, and received the Sergeant-of-the-Year Award.[35]

Defendants offered two non-discriminatory reasons for not reclassifying Bolt. Defendants contended that Bolt presented no evidence that Sheriff Barrett knew of his desire to be reclassified, and that Bolt did not complete the lieutenant's exam. Defendants' explanation that Bolt failed to inform Sheriff Barrett of his desire to be reclassified could be a legitimate, non-discriminatory reason for failing to reclassify him if the sworn officers who were reclassified had informed the Sheriff of their desire to be reclassified. However, the record does not demonstrate that those four reclassified officers expressed any interest to Sheriff Barrett in being reclassified. Defendants' other proffered explanation for failing to reclassify Bolt also is inadequate. Bolt's failure to complete the lieutenant's exam affects only his eligibility for promotion to the position of classified

---

[35]Smith was reclassified as a classified sergeant in July 1994.

lieutenant; it does not alter his eligibility for reclassification, which is based solely on his performance of the duties of the higher position, and does not require completion of the formal requirements for promotion. A reasonable jury could have disbelieved these reasons and found the real reasons for the failure to reclassify to be race-based discrimination. As stated previously, the evidence of Sheriff Barrett's intentional race discrimination against Bolt, combined with evidence of Barrett's understanding that such discrimination violated federal law, is sufficient to sustain the jury's award of punitive damages as well. A reasonable jury could have concluded that Sheriff Barrett intentionally discriminated against Bolt with knowledge that doing so violated Bolt's federally protected rights. *See* discussion *supra* section IV-A1.

As for Smith, the Defendants argue that the jury in its special verdict form concluded that Smith should have been reclassified as of November 1992, before Sheriff Barrett assumed office. They contend, therefore, that Sheriff Barrett cannot be held liable for Smith's not being reclassified. Defendants' argument is unpersuasive. The fact that the jury determined that Smith should have been reclassified as of November 1992, does not mean that the jury could not also have reasonably found that Sheriff Barrett should have reclassified him upon taking office soon thereafter. The jury could have concluded that because Smith was qualified for reclassification in November 1992, Sheriff Barrett should have known this fact when she took office in December and should have reclassified him as soon as she had the power to do so. Accordingly, we affirm the entry of the jury's verdict of compensatory damages and injunctive relief for Smith but order that Smith's backpay be recalculated from December 14, 1992, when Sheriff Barrett took office, instead of from November 1992.[36]

E.      *Promotional Examination Claims*

The fifth type of employment discrimination involved allegations that the Defendants prevented three of the Plaintiffs from taking promotional examinations. Sergeants Bantin, Smith, and Schaefer alleged they were not permitted to sit for the lieutenant's examination because of their race. The Personnel Board

---

[36]The jury did not award punitive damages to Smith.

administers the eligibility requirements for taking a promotional examination for a classified rank within the Sheriff's Department. In order to take the promotional examination for the rank of lieutenant, the applicants had to submit an application showing, among other things, that they had two years of experience at the rank of sergeant or its equivalent. All three Plaintiffs received notices of ineligibility for the examination from the Personnel Board because they did not have the required experience. Plaintiffs argued that three black deputies were permitted to sit for the examination even though they had served less time as sergeants than had the Plaintiffs. None of the jury verdicts against either Sheriff Barrett or Fulton County withstand appellate review.

With respect to Sheriff Barrett, the Plaintiffs have failed to demonstrate the required causation because they presented no evidence indicating that Sheriff Barrett or the Sheriff's Department played a role in designating Bantin, Smith, and Schaefer ineligible to take the promotional examination for the position of classified lieutenant. Moreover, as we have explained previously, Sheriff Barrett is not the "final policymaking authority" for employment decisions related to *classified* positions generally or for decisions related to eligibility to take promotional exams for classified positions more specifically. Notably, in Fulton County, applicants for classified positions are recruited and screened by the Personnel Department and classified employees enjoy civil-service type protections. *See Scala v. City of Winter Park,* 116 F.3d 1396, 1402-03 (11th Cir.1997) (holding that the city manager and public safety director of Winter Park, Florida were not final policymakers because their termination decisions were subject to meaningful administrative review by a city civil service board). Based on this conclusion, and our determination that there was no "policy or custom" of discrimination against white employees in Fulton County, Fulton County also cannot be held liable under section 1983 for Plaintiffs' promotional examination claims.

*F.      Restoration of Rank Claims*

The final jury verdicts Defendants challenge pertain to the restoration of rank claims of Sergeant Charles Alexander and Corporal Robert Upshaw. Both Alexander and Upshaw voluntarily accepted

57

reductions in rank in order to be transferred out of the Jail. Both accepted demotions to the position of deputy and were transferred to the Court Services Division prior to the Barrett regime.[37] They argued they were treated differently with regard to the restoration of their rank than was Sergeant Barbara Woodward, a black officer, who also voluntarily surrendered her rank in order to be transferred from the Jail but later had her rank restored.

As Sheriff Barrett argued, however, Woodward was not similarly situated to Alexander and Upshaw because she left the Jail due to a medical condition and contested her loss of rank with the Grievance Review Committee, which then recommended that she be restored to the rank of sergeant. Neither Alexander nor Upshaw sought relief for giving up their rank, even though they knew of the existence of the Grievance Review Committee. In addition, both Alexander and Upshaw failed to present any evidence showing that Sheriff Barrett had any personal involvement in the failure to have their ranks restored. On this record, we conclude, that no reasonable jury could find the failure of Sheriff Barrett to restore the ranks of Alexander and Upshaw was the result of race-based discrimination. Defendants are, therefore, entitled to judgment as a matter of law on these claims.

V.

In sum, we affirm the district court's denial of qualified immunity to Sheriff Barrett, the denial of the Defendants' motion for judgment as a matter of law as to Fulton County's liability under section 1983, the denial of the Defendants' motion for severance of the Plaintiffs' individual claims of discrimination, and its jury instructions. We also find that the Defendants did not suffer substantial injustice as a result of the court's erroneous evidentiary rulings. With respect to the Defendants' challenge to the sufficiency of the evidence, we hold that the evidence was sufficient to support the jury's verdict on the following claims: the discriminatory discipline claims of A.M. Alexander and NeSmith; the failure to promote claims of Fox,

---

[37]While at Court services in 1993, Alexander successfully competed for promotion to the rank of sergeant, and was promoted to that rank on October 12, 1993. Presumably, therefore, Alexander is claiming that Sheriff Barrett discriminated against him by not restoring his rank between December 14, 1992, the first day of Sheriff Barrett's tenure, and October 12, 1993, the date of his promotion.

58

Gettis, Masson, and NeSmith;  the discriminatory transfer claim of Jones;  and the reclassification claims of Bolt and Smith.  However, we are constrained to find that the evidence was insufficient to support the jury's verdicts on the following claims and awards:  Brook's failure to promote claim;  the transfer and assignment claims of Brooks, Fox, Masson, Moore, Schaefer and Steele and their punitive damages awards for those claims;  the promotional examination claims of Bantin, Schaefer, and Smith and their punitive damages awards for those claims;  and the restoration of rank claims of Charles Alexander and Upshaw.  We also reverse the district court's grant of back pay and individual injunctive relief to Gettis and Masson.  Finally, we instruct the district court to recalculate Smith's back pay and benefits from December 14, 1992.

In short we AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.